[No. B223330. Second Dist., Div. Five. Mar. 30, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD ARIAS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION**\***]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part II.B. through E. of the Discussion.

**COUNSEL**

Linda Acaldo, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Mary Sanchez and David Zarmi, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KUMAR, J.*—Defendant, a member of the Rebels street gang, went on a mission late one evening to locate and "blast" a member of a rival gang—The Magicians Club (TMC). In an effort to find TMC gang members, defendant summoned 17-year-old Wanner Luna out of his apartment and pointed a gun at him. Defendant asked him whether he was a member of TMC and if he knew the location of TMC gang members. Luna denied membership in the rival gang. Nevertheless, defendant, still holding the gun, walked behind Luna for approximately 15 feet to Luna's apartment, so that defendant could search for TMC gang members. Defendant left the apartment after finding no TMC gang members. Defendant then encountered Byron Delcid in the hallway. Defendant pointed the gun at him and asked if he was a TMC gang member. Delcid said he was not a member of the gang, whereupon defendant ordered him into an apartment and left the scene.

A jury convicted defendant of kidnapping (Pen. Code, § 207, subd. (a))[1] and two counts of assault with a semiautomatic firearm (§ 245, subd. (b)). In addition, the jury found defendant used a firearm in the commission of the offenses (§ 12022.53, subd. (b) [kidnapping]; § 12022.5, subd. (a) [assaults]) and that the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). He was sentenced to 20 years four months in state prison and ordered to pay statutory fees/fines.

Defendant contends the trial court improperly denied his motion for judgment of acquittal on kidnapping; there was insufficient evidence to establish the gang enhancement; the trial court erred by punishing him for both firearm and gang enhancements; the trial court did not award him the appropriate amount of presentence custody credit; and the trial court improperly imposed court facilities assessments. We reject defendant's contentions, require modification of the abstract of judgment to reflect less presentence custody credit, and affirm the judgment.

## I. FACTS

### A. Prosecution Evidence

#### 1. Defendant Begins His Search for TMC Gang Members

Wanner Luna began his testimony by stating, "I'm not here to press charges. I'm just here to say what happened that night." He was concerned a street gang would "go after" him because he testified.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] All further statutory references are to the Penal Code unless otherwise indicated.

The events he testified to occurred near midnight on December 12, 2008. It was then that Luna heard someone calling his name from outside his apartment building. He exited the building and observed defendant standing with a girl.

Defendant pointed a gun toward Luna's chest or stomach. Defendant asked if Luna knew the location of TMC gang members and whether Luna was a TMC gang member. Luna replied, "No." Defendant told Luna to lift up his shirt so defendant could examine Luna's stomach for TMC tattoos. Luna complied—he did not have any TMC tattoos.

Luna was "scared" and "just following [defendant's] directions." Defendant and the female walked behind Luna for about 15 feet to Luna's apartment door. Defendant still had the gun. Luna took the situation seriously and asked defendant to "chill." He went to the apartment because he was afraid and defendant had a gun. Although defendant entered the apartment, Luna did not invite defendant into his apartment and did not want him to enter his apartment.

When they reached the apartment, defendant said, "I'm telling you again, where the TMC's at [*sic*]?" Luna said he did not know the location of the gang members, and asked defendant to leave. Defendant, however, ascended the apartment's stairs to the second story. Luna followed. He explained, "[I] thought [defendant] was going . . . to do something like check the rooms. And my mom was sleeping, and he had a gun. . . ." Defendant eventually left the apartment. Luna locked the door and could hear defendant confront another individual.

### 2. Defendant Encounters Byron Delcid

After leaving Luna's apartment, defendant saw Byron Delcid in the hallway. Delcid was in the apartment building to visit his brother-in-law. Defendant pointed the gun at Delcid's stomach, asked him if he was a TMC gang member, and instructed him to lift up his shirt. Delcid lifted his shirt, showed defendant that he had no tattoos, and indicated he was not a TMC gang member. He was afraid defendant might enter the apartment and harm Delcid's family.

Delcid's sister-in-law opened the apartment door. Defendant told Delcid to enter the apartment and close the door. He followed defendant's instruction.

### 3. The Arrest

Near midnight on December 12, 2008, Los Angeles Police Department (LAPD) Officer Otis Antoine received a radio call regarding a male and female suspect. He then observed defendant and Marelin Martinez (Martinez) walking on Vine Street. They matched the description of the suspects.

The officer called defendant over. Defendant approached the officer. He placed his hands in the air, whereupon a handgun fell off of defendant's person and hit the ground.[2] Defendant was arrested and spontaneously stated, "Fuck TMC. I'm down here to blast a fool. They shot me in my heel. Fuck TMC."

### 4. Gang Evidence

LAPD Officer Melvin Martinez was assigned to monitor the Rebels street gang. The officer had approximately four consensual encounters with defendant wherein defendant admitted he was a member of the Rebels. Further demonstrating his gang membership, defendant had gang-related tattoos on his body, including but not limited to, the word "Rebels" tattooed on his eyebrow and stomach as well as an "R" tattooed on the back of his head. Defendant's female accomplice was also an admitted member of the Rebels and had tattoos consistent with her membership.

TMC was a rival of the Rebels gang. The building where the crimes were committed was located in an area considered to be TMC territory.

Officer Martinez opined the crimes benefited the Rebels because they enhanced the gang's reputation. He explained that, by seeking to shoot a member of a rival gang who harmed a Rebels gang member, the Rebels gang member demonstrates strength. Indeed, if a Rebels gang member does not retaliate under these circumstances, he could be assaulted by his fellow gang members or removed from the gang. In addition, when a gang member commits a crime in a rival gang member's territory, he elevates his status within his gang.

The officer further opined the crimes were committed in association with a criminal street gang because two gang members were together. The presence of a second gang member allowed for a "lookout" and a witness to vouch for the gang member who committed the crimes.

---

[2] Delcid was shown a photograph of the gun and identified it as the one that defendant pointed at him.

## B. Defense

Defendant testified on his own behalf. He met Luna at a juvenile camp he was required to attend due to the commission of a prior crime. At the camp, the two became best friends. On December 12, 2008, he spoke to Luna on the phone before going to his apartment. Luna said he had not seen defendant in a while so defendant responded, "[D]on't trip. I'll be there. Just give me a few minutes." Luna provided defendant with directions to the apartment and asked defendant to scream Luna's name when he arrived. According to defendant, Luna's apartment was not in TMC territory.

Defendant arrived at Luna's apartment approximately 10 minutes later with Martinez. They screamed Luna's name and Luna came outside. Defendant did not point a gun at Luna and he was not there to shoot TMC gang members. He went into Luna's apartment and the two conversed on the couch. Defendant and Martinez left after about 20 minutes.

Defendant encountered Delcid in the hallway and said, "[W]hat's up fool?" Defendant did not believe Delcid was a gang member and did not say any "gang-related stuff" to Delcid. After Delcid told defendant his name, defendant exited the building. Defendant may have accidently displayed his gun to Delcid because the gun was in his waistband and was visible at some point. Delcid was afraid because of defendant's tattoos.

Defendant did not make the statement regarding TMC to the arresting officer. He had not been shot in the foot by a TMC gang member.

For the most part, Martinez provided testimony that was consistent with defendant's testimony. Martinez indicated both she and defendant were Rebels gang members. She explained Luna invited the two of them into the apartment. Although defendant was carrying a gun, he did not point it at Luna or ask Luna to lift his shirt.

When they encountered Delcid, defendant asked Delcid who he was but Martinez indicated she knew Delcid and they should leave the building. Defendant did not point a gun at Delcid.

Raymond Cuevas, a former Rebels gang member who had spent time in prison for committing robbery, opined that there was merely a "little animosity" between TMC and the Rebels.

Defendant's investigator, Charles Watson, questioned Luna about the gun. Luna told Watson that defendant did not have a gun when he came to the apartment.

### C. Rebuttal

LAPD Officer James Fillmore explained the origins of TMC and the Rebels. He opined the two gangs were rivals and that Luna's building was located in TMC territory. Luna was a former member of the White Fence gang—another rival of the Rebels.

## II. DISCUSSION

### A. The Motion for Judgment of Acquittal

"On a motion by defendant under section 1118.1, a trial court must 'order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal.' [Citation.] 'The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case.' [Citation.]" (*People v. Lopez* (2010) 185 Cal.App.4th 1220, 1228 [111 Cal.Rptr.3d 232].)

In reviewing the trial court's ruling denying a motion for judgment of acquittal, we apply the same standard used to assess whether sufficient evidence supports the conviction. (*People v. Cuevas* (1995) 12 Cal.4th 252, 261 [48 Cal.Rptr.2d 135, 906 P.2d 1290].) That standard requires us to review the record " ' "in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citations.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 104 [8 Cal.Rptr.3d 271, 82 P.3d 296].)

In order to establish a kidnapping under section 207, subdivision (a), the prosecution must prove " '(1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance.' [Citation.]" (*People v. Bell* (2009) 179 Cal.App.4th 428, 435 [102 Cal.Rptr.3d 300].) In determining whether the third element, asportation, has been satisfied, a trier of fact may consider "not only the actual distance the victim is moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's

foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes." (*People v. Martinez* (1999) 20 Cal.4th 225, 237 [83 Cal.Rptr.2d 533, 973 P.2d 512].)

Defendant contends the trial court erred by denying his section 1118.1 motion because there was insufficient evidence of asportation. In order to find merit to this claim, we would have to conclude that no rational trier of fact could have decided this element was satisfied after the prosecution's case-in-chief. Based on the record, we are not inclined to reach such a conclusion and, therefore, reject defendant's claim.[3]

■ A rational trier of fact could have concluded defendant was on a mission to locate and shoot a TMC gang member and, in an effort to do so, he pointed a gun at Luna, and followed him to the apartment to search for TMC gang members. Luna testified he did not want defendant to enter his apartment but was "scared" and "just following [defendant's] directions." A rational trier of fact could have concluded that Luna was involuntarily moved 15 feet to the inside of his apartment in order to allow defendant to facilitate his search for TMC gang members.

The movement of Luna increased his risk of harm in that he was moved from a public area to the seclusion of his apartment. Similarly, by scaring Luna into moving away from a public place, it was less likely defendant would have been detected if he had committed an additional crime. These factors support the asportation requirement for kidnapping. (See *People v. Shadden* (2001) 93 Cal.App.4th 164, 168–169 [112 Cal.Rptr.2d 826] [movement of nine feet to the back of a store meets asportation requirement of kidnapping]; *People v. Smith* (1995) 33 Cal.App.4th 1586, 1594 [40 Cal.Rptr.2d 31] [movement of victim from driveway "open to street view" to camper increased risk of harm to victim].)

We respectfully disagree with the dissent's assertion that we have applied the wrong standard in assessing the asportation element of simple kidnapping. Unlike aggravated kidnapping, asportation for simple kidnapping does not *require* a finding of an increase in harm to the victim or other contextual factors. (*People v. Bell, supra*, 179 Cal.App.4th 428, 436–437, citing *People v. Martinez, supra*, 20 Cal.4th at p. 237.) However, *Martinez* expressly holds

---

[3] Defendant limits his argument to the asportation element. We note that, in assessing the first two elements, the movement may be accomplished by "any . . . means of instilling fear" in the victim. (*People v. Majors* (2004) 33 Cal.4th 321, 326 [14 Cal.Rptr.3d 870, 92 P.3d 360].) Luna testified he was following defendant's directions and did not want defendant in his apartment. In addition, he explained he went to his apartment because he was afraid and defendant had a gun. This evidence supports a conclusion that Luna moved to his apartment out fear of noncompliance with defendant's will.

that the increase of harm and other contextual factors may be considered in determining whether asportation for simple kidnapping has been proved. (*People v. Martinez, supra,* 20 Cal.4th at p. 237.)

We recognize Luna was equivocal in his testimony. However, his fear caused him to be a very reluctant witness. It is true that a rational trier of fact could have concluded Luna simply walked away from defendant and defendant followed Luna to his apartment for a friendly chat. But, a reviewing court is not permitted to reverse a conviction on the ground of insufficient evidence simply because the facts could be reconciled with a finding of innocence, or of guilt of a lesser crime. (See *People v. Hill* (1998) 17 Cal.4th 800, 849 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Rather, we must construe the facts in the light most favorable to the prosecution. After doing so, we hold the trial court did not err in denying defendant's motion for judgment of acquittal.

B.–E.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. DISPOSITION

The judgment is modified to reflect 449 actual days of presentence credit and 67 days of conduct credit. The trial court shall forward an amended abstract of judgment reflecting the conduct credits to the Department of Corrections and Rehabilitation. In all other respects the judgment is affirmed.

Kriegler, J., concurred.

**ARMSTRONG, Acting P. J.,** Dissenting.—Wanner Luna, the purported victim of a kidnapping, testified that his former juvenile camp dormmate showed up at his apartment house late one night drunk, looking for gang members and waving a gun; this frightened Luna. After defendant entered the building, he and Luna walked 15 feet down a hallway and through the open door to Luna's apartment. Luna did not testify that defendant forced him into the apartment; rather, he repeatedly stated that they walked together down the hallway and into the unit. From these circumstances, coupled with the fact that defendant walked behind Luna, the majority infers that defendant made Luna walk to his apartment at gunpoint. Because I conclude that this inference is not reasonable in light of the evidence presented at trial, I cannot concur in affirming the kidnapping conviction. I also conclude that the majority has erroneously applied the asportation standard announced in

---

[*]See footnote, *ante,* page 1428.

*People v. Martinez* (1999) 20 Cal.4th 225 [83 Cal.Rptr.2d 533, 973 P.2d 512].
I therefore respectfully dissent.

" 'The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to [Penal Code] section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." ' [Citation.] 'The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case.' [Citations.] The question 'is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination.' [Citation.] The sufficiency of the evidence is tested at the point the motion is made. [Citations.] The question is one of law, subject to independent review." (*People v. Stevens* (2007) 41 Cal.4th 182, 200 [59 Cal.Rptr.3d 196, 158 P.3d 763].)

Thus, to the majority's recitation of the standard of review I would add only that this court is to review " ' "the *entire* record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Valdez* (2004) 32 Cal.4th 73, 104 [8 Cal.Rptr.3d 271, 82 P.3d 296], italics added.) We are not free to ignore, for example, the undisputed evidence that Luna's apartment door was open (thus negating any reason for defendant to force Luna's movement), or that Luna not only did not testify that he walked to his apartment at gunpoint, but stated that he did not know where defendant's gun was at that point in time.

In order to evaluate the entire record to assess the sufficiency of the evidence, it is important to understand the physical space making up the supposed crime scene. This space can be divided into three parts, each one of which was the locus of discrete activity and only one of which was the site of the charged kidnapping. First, when Luna opened the front door to his apartment building in response to hearing his name, he found defendant (and a female companion) on the front walk; they were separated by a series of steps, which led up to the door of the complex. It was in this location that defendant waved his gun in a drunken fashion, demanding to know "where TMC's at," and to inspect Luna's torso for gang tattoos. After Luna lifted his shirt to demonstrate the absence of tattoos, defendant continued to hunt for

TMC gang members, but gave no indication that he believed Luna to be a member of TMC, or of any other gang. This location is the site of defendant's assault on Luna.

Defendant left the first location by ascending a series of stairs and entering the apartment building. At this point, defendant was standing next to Luna and, according to respondent, had not yet commenced to kidnap him. This second space consists of the hallway leading from the front door of the building to Luna's apartment, the door of which Luna had left open when he looked to see who was outside. This is the site of the charged kidnapping, a distance of 15 level feet, with no stairs. Luna walked down the hallway and into his apartment; defendant followed him.

The third location about which Luna testified was the inside of his family's two-story apartment. When defendant reached Luna's apartment, he immediately started to ascend the interior stairs; Luna followed him. Nothing that defendant or Luna did or did not do inside the apartment plays any part in the People's prosecution of this case. That is to say, according to the prosecution's theory of the case, the assault was complete when defendant was outside the building; the kidnapping was complete when Luna and defendant entered the apartment; no crime was committed, or attempted, inside the apartment.

"Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." (Pen. Code,[1] § 207, subd. (a).) The elements of kidnapping are: " '(1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance.' (*People v. Jones* (2003) 108 Cal.App.4th 455, 462 [133 Cal.Rptr.2d 358].)" (*People v. Bell* (2009) 179 Cal.App.4th 428, 435 [102 Cal.Rptr.3d 300].) In order to constitute the crime of kidnapping, the movement must be forcible; the force applied need not, however, be physical. " ' "The movement is forcible where it is accomplished through the giving of orders which the victim feels compelled to obey because he or she fears harm or injury from the accused and such apprehension is not unreasonable under the circumstances." ' " (*People v. Alcala* (1984) 36 Cal.3d 604, 622 [205 Cal.Rptr. 775, 685 P.2d 1126].) If, however, the defendant does not say or do anything to force the

---

[1] Further statutory references are to the Penal Code.

victim to move, he has not committed the crime of kidnapping. In this case, it is the absence of evidence that defendant said or did anything to force Luna to move from which I conclude that the People failed to prove their case.

Here, the People relied on Luna's testimony to prove the kidnapping charge, which respondent summarizes as follows: "Luna walked in front of [defendant] to his apartment door, a distance of about 15 feet, under threat of defendant's gun . . . ." This phrasing suggests that there is direct evidence that defendant held a gun at Luna's back and ordered him to return to his apartment. However, Luna did not so testify. Rather, Luna testified that defendant "went inside with the girl. He walked in, and then he went inside my apartment"; "He was walking, like, towards—because to my building, you have to walk up some stairs. So he walked up the stairs, and he told me where the TMC's at, and I was like, I don't know. So then, like, he walked, like—because the door was open from my house, he walked in, and he went all the way up"; "He was behind me. Yes, he went inside the apartment with me"; "Q: So you started walking to your apartment? A: Yes. Q: And he came with you? A: Uh-Huh."

The majority opinion, in apparent recognition of the fact that there is no *direct* evidence of force, states that the jury could have reasonably inferred that defendant "pointed a gun at Luna, and followed him to the apartment to search for TMC gang members." However, the evidence presented at trial does not support such an inference:

"Q: When you were walking to your apartment, did he still have the gun out?

"A: When he was walking to my apartment?

"Q: Yes.

"A: Did he have the gun out? Not, like, pointing it at me.

"Q: Where was he pointing it?

"A: I don't remember.

"Q: But he still had the gun in his hands?

"A: If he had it, I don't know. I don't remember. I was just walking. . . . I was walking in front of him."

Luna later testified that defendant never threatened him.

This testimony renders unreasonable the proposed inference that Luna walked to his apartment at gunpoint or "under threat of defendant's gun." That is to say, it is not reasonable to conclude that Luna's movement was in response to having a gun pointed at him, when he did not remember whether, at that point in time, defendant was holding the gun, and testified that defendant never threatened him. It is, rather, mere speculation unsupported by the evidence. " 'While substantial evidence may consist of inferences, such inferences must be "a product of logic and reason" and "must rest on the evidence" [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citations].' [Citation.]" (*Casella v. SouthWest Dealer Services, Inc.* (2007) 157 Cal.App.4th 1127, 1144 [69 Cal.Rptr.3d 445].)

In fact, Luna did not give a clear account of the exact circumstances under which he walked from the building's front door to his apartment door. What *is* clear is that Luna did not testify that he did so at defendant's order, suggestion, or request, or in response to any verbal, visual or physical directive. In reply to the only direct question of why he traversed these 15 feet, Luna answered, "Because I didn't want no—I don't know. Because there was drama. I told him to, like, just chill. Like, to calm down. . . . [¶] . . . [¶] I guess he was drunk or something. I told him to calm down." Luna explained that he was afraid, and that he turned around and walked to his apartment. While one may reasonably infer from this testimony that Luna walked to his apartment because he was afraid, one may not reasonably infer that he walked to his apartment because defendant forced him to do so. Neither is it reasonable to conclude from the fact that Luna was behaving in an accommodating manner (by, for example, leading defendant to his apartment) that defendant was demanding the accommodating behavior.

The majority posits that defendant kidnapped Luna so that he could search his apartment for TMC gang members. This conclusion does not square with the fact that the apartment door was open. Defendant did not need Luna to move in order to gain access to the apartment and conduct his search. It is not reasonable to conclude that defendant kidnapped Luna in order to search his apartment when he could have conducted the search without Luna's assistance.

In sum, there would be no question that there was no kidnapping if Luna had followed, rather than led, defendant to his apartment. Yet there is no

evidence upon which to ground an inference that Luna was in front of rather than behind defendant because defendant wanted it that way. In my view, the evidence simply does not support an inference of forced movement.

Defendant also maintains that the prosecution failed to establish the asportation element of simple kidnapping; that is, that the space over which the prosecution alleged that defendant moved Luna—the 15 feet between the front door of the apartment building and the front door of Luna's apartment—was a "substantial distance." Because I believe that the majority uses inapposite authority to find the distance substantial, I review the case law defining the asportation element of simple kidnapping at some length.

I note first that multiple statutes make unlawful the crime of kidnapping. Thus, section 207, subdivision (a) prohibits "simple" kidnapping, defined as forcibly, or by any other means of instilling fear, carrying a person "into another country, state, or county, or into another part of the same county." Other statutes proscribe kidnapping in conjunction with another crime: kidnapping a child under 14 for the purpose of committing any act defined in section 288 (§ 207, subd. (b)); kidnapping for ransom, reward, or extortion (§ 209, subd. (a)); and kidnapping to commit robbery or sexual assault (§ 209, subd. (b)). The asportation element of simple kidnapping has developed through the case law independently from asportation in the context of kidnapping for the purpose of committing another crime, as I explain below.

The asportation element of the crime of kidnapping has a long and confusing history. In the middle of the last century, California law was clear that, if a victim was moved without his or her consent by force or fear, the crime of kidnapping had been committed: "It is the fact, not the distance, of forcible removal which constitutes kidnaping in this state." (*People v. Chessman* (1951) 38 Cal.2d 166, 192 [238 P.2d 1001].)

That rule of law was abrogated in *People v. Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225] (hereafter *Daniels*), where the defendants were convicted of kidnapping for the purpose of robbery. The court held that "when in the course of a robbery a defendant does no more than move his victim around inside the premises in which he finds him—whether it be a residence, as here, or a place of business or other enclosure—his conduct generally will not be deemed to constitute the offense proscribed by section 209. Movement across a room or from one room to another, in short, cannot reasonably be found to be asportation 'into another part of the same county.' (Pen. Code, § 207.)" (*Id.* at p. 1140.) The new asportation test for aggravated kidnapping announced in *Daniels* was two pronged: (1) the movement of the

victim must not be "merely incidental to the commission of the robbery"; and (2) such movement must "substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." (*Id.* at p. 1139.)

The *Daniels* asportation test was explicated in a number of subsequent Supreme Court opinions: "As for the first prong, or whether the movement is merely incidental to the crime of robbery, the jury considers the 'scope and nature' of the movement. (*People* v. *Daniels, supra,* 71 Cal.2d at p. 1131, fn. 5.) This includes the actual distance a victim is moved. However, we have observed that there is no minimum number of feet a defendant must move a victim in order to satisfy the first prong. [Citation.] [¶] . . . [¶] The second prong of the *Daniels* test refers to whether the movement subjects the victim to a substantial increase in risk of harm above and beyond that inherent in robbery. (*In re Earley*[ (1975)] 14 Cal.3d [122,] 131 [120 Cal.Rptr. 881, 534 P.2d 721]; *People* v. *Lara* (1974) 12 Cal.3d 903, 908 & fn. 4 [117 Cal.Rptr. 549, 528 P.2d 365].) This includes consideration of such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. (See, e.g., *People* v. *Lara, supra,* 12 Cal.3d at p. 908 & fn. 4 [examples of such risk of harm 'include not only desperate attempts by the victim to extricate himself but also unforeseen intervention by third parties']; *In re Earley, supra,* 14 Cal.3d at p. 132 ['asportation gave rise to dangers, not inherent in robbery, that an auto accident might occur or that the victim might attempt to escape from the moving car or be pushed therefrom by [defendant]']; cf. *People* v. *Caudillo* (1978) 21 Cal.3d 562, 574 [146 Cal.Rptr. 859, 580 P.2d 274] [aggravated kidnapping includes review of such factors as 'the defendant's motivation to escape detection' and 'the possible enhancement of danger to the victim resulting from the movement.'].) The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased." (*People v. Rayford* (1994) 9 Cal.4th 1, 12–14 [36 Cal.Rptr.2d 317, 884 P.2d 1369].)

Because the *Daniels* court specifically referred to section 207,[2] there arose a question of whether the asportation requirement of aggravated kidnapping with which the court was concerned in *Daniels* applied as well to the offense of simple kidnapping. That question was answered in *People v. Stanworth* (1974) 11 Cal.3d 588 [114 Cal.Rptr. 250, 522 P.2d 1058] (hereafter *Stanworth*), which rejected the *Daniels* asportation test for simple kidnapping.

In *Stanworth*, the court considered the defendant's contention that "the rule announced by us in *Daniels* applies not only to aggravated kidnaping (§ 209)

---

[2] In fact the court relied extensively on its reasoning in an earlier case (*Cotton v. Superior Court* (1961) 56 Cal.2d 459 [15 Cal.Rptr. 65, 364 P.2d 241]), in which it set aside an indictment charging the petitioners with simple kidnapping, due to an insufficient showing of asportation.

but to so-called simple kidnaping (§ 207)." (*Stanworth, supra,* 11 Cal.3d at p. 596.) The court concluded that it does not. "[W]here only simple kidnaping is involved, it is clear that the victim's movements cannot be evaluated in the light of a standard which makes reference to the commission of another crime." (*Id.* at p. 600.) Thus, in determining whether the evidence supported the asportation element of simple kidnapping, the court refused to consider such factors as whether the movement increased the risk of harm to the victims, and instead assessed only whether the distance the victims involuntarily traversed was not slight or trivial but substantial. (*Id.* at p. 601.) The *Stanworth* court concluded that the one-quarter mile which the victims were forced to walk "cannot be reasonably regarded as slight or insubstantial." (*Id.* at p. 603.)

The Supreme Court confirmed the "distance alone" standard of asportation for simple kidnapping several years later in *People v. Caudillo, supra,* 21 Cal.3d 562 (hereafter *Caudillo*). In *Caudillo,* the defendant accosted the victim on the elevator of her apartment building and forcibly moved her to a storage room next to the elevator, where he kept her for 20 minutes before taking her to her apartment down the hall from the storage room, where he sexually assaulted her. The actual distance from the elevator to the storage room to the victim's apartment was not mentioned in the opinion, but was apparently less than measurements found to be trivial or insubstantial in earlier Supreme Court cases. (*Id.* at pp. 573–574.) Thus, the People sought to introduce considerations other than actual distance—for instance, the defendant's movement of the victim to the storage room to avoid detection—to assess whether there had been "sufficient movement" for purposes of section 207. The court rejected this approach: "Neither the incidental nature of the movement, the defendant's motivation to escape detection, nor the possible enhancement of danger to the victim resulting from the movement is a factor to be considered in the determination of substantiality of movement for the offense of kidnaping. Such factors would be relevant in a *Daniels* situation of aggravated kidnaping—a kidnaping for the purpose of robbery (Pen. Code, § 209)—but we held in *Stanworth* that the *Daniels* test was not applicable to simple kidnaping under Penal Code section 207." (21 Cal.3d at p. 574.)

Following the *Stanworth/Caudillo* rulings, the "distance alone" standard of asportation was applied by the appellate courts to reverse convictions for simple kidnapping for distances deemed not substantial. (*People v. Thornton* (1974) 11 Cal.3d 738, 767 [114 Cal.Rptr. 467, 523 P.2d 267] [rape victim forced from front to rear of laundromat; "[b]ecause the sexual assault there took place wholly within the confines of a single room in a laundromat, any asportation involved was not ' "into another part of the same county" ' "]; *People v. Brown* (1974) 11 Cal.3d 784 [114 Cal.Rptr. 426, 523 P.2d 226] [victim forced through own house and 75 feet outside house]; *People v. Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468] [90 feet]; *People v. Sheldon*

(1989) 48 Cal.3d 935 [258 Cal.Rptr. 242, 771 P.2d 1330] [movement of victim from attached garage into house, through hall and three rooms]; *People v. Daly* (1992) 8 Cal.App.4th 47 [10 Cal.Rptr.2d 21] [40 feet across parking lot to defendant's van].) Thus, were *Stanworth* and *Caudillo* the last word on the asportation element of simple kidnapping, defendant's conviction in this case, based on asportation of 15 feet, would indisputably require reversal.

In *People v. Martinez, supra*, 20 Cal.4th 225 (hereafter *Martinez*), the Supreme Court reconsidered its rulings that distance alone is determinative of the asportation element of simple kidnapping. The facts in *Martinez* were these: The defendant had rented a room from a family consisting of a husband and wife, their two daughters, ages 13 and 15, and their niece and her two children. The defendant returned home late one night and instigated a violent confrontation with the family, forcing family members to lock themselves in the bathroom. The husband and his older daughter escaped and sought help. While holding a knife in one hand and a hammer in the other, the defendant put the knife to the niece's ribcage and demanded that the 13-year-old girl take him to her sister. Still holding the knife and with blood dripping from his hands, the defendant led the young girl through the next room, through the kitchen and the defendant's room, across a 15-foot porch to a point outside the home across the backyard and parking area approximately 40 to 50 feet behind the residence. The jury found the defendant guilty of kidnapping a child under the age of 14 in violation of sections 207, subdivision (a) and 208, subdivision (b), as well as assault with a deadly weapon, false imprisonment, and making terrorist threats. (20 Cal.4th at pp. 230–231.)

On appeal, the Supreme Court was faced first with the question of whether section 208, subdivision (b) is a separate crime or a punishment provision. Upon concluding that it is a separate offense, the court was required to determine which standard applied to the asportation element, that of simple kidnapping, in which case *Stanworth* and *Caudillo* controlled, or aggravated kidnapping, in which case *Daniels* applied. After reaffirming that the movement of the victim must be "substantial in character" to meet the asportation requirement for simple kidnapping, the court overruled the "actual distance only" standard, holding that the trier of fact may consider more than actual distance in evaluating whether there is sufficient evidence of asportation. Specifically, the trier of fact may consider the totality of the circumstances, including "the 'scope and nature' of the movement and the increased risk of harm to the victim." (*Martinez, supra*, 20 Cal.4th at p. 236.) The court emphasized, however, "that contextual factors, whether singly or in combination, will not suffice to establish asportation if the movement is only a very short distance." (*Id.* at p. 237.) Because the distance traversed in *Martinez* was less than the distances deemed "insufficient as a matter of law" in

*People v. Green, supra*, 27 Cal.3d at page 67 (90 feet) and *People v. Brown, supra*, 11 Cal.3d 784 (75 feet), the court declined to apply its holding retroactively and reversed the defendant's conviction for simple kidnapping.

The rationale for the court's analysis is readily apparent: In two factual situations where the defendants not only moved their victims but rendered them substantially more vulnerable to the defendant's criminal intentions, the Supreme Court reversed kidnapping convictions because the distances traversed were slight compared with distances found insubstantial in earlier cases. The victim in *Caudillo* was snatched from an elevator, held captive in a storage room to avoid detection, and dragged to her apartment where she was forced to unlock the door; having thus moved his victim into her own home, the assailant was able to, and did, assault her at will over a substantial period of time without fear of interruption. Regardless of the precise number of feet the victim was moved against her will, the circumstances of the asportation in *Caudillo* can hardly be characterized as trivial. Similarly, in *Martinez*, the defendant broke down the door of the bathroom where the victim and her family sought protection from the defendant's violent rampage, grabbed his young victim with his bloody hands and, with knife in hand, physically forced her through three rooms, across a 15-foot porch, and across the backyard and parking area, a total distance approaching 90 feet. As in *Caudillo*, the circumstances, if not the distance, of the asportation were not trivial.

Respondent's position that Luna's movement from the front door of the building to the threshold of his apartment, a distance of 15 feet, met the asportation element of simple kidnapping must be evaluated by the standards set forth in *Martinez*.[3] In this regard, I am mindful that, prior to 1999, there is no doubt that defendant's conviction for kidnapping would be subject to reversal; thus, a ruling affirming defendant's conviction must be consonant with the rationale as well as the rule of *Martinez*.

First, I note that the 15 feet at issue in this case is a substantially slighter distance than those at issue in the cases cited above. Respondent offers a single case, *People v. Shadden* (2001) 93 Cal.App.4th 164 [112 Cal.Rptr.2d 826], which concerned a distance less than that at issue here. In *Shadden*, the victim was moved nine feet, from her video store to the store's back room. The appellate court found this asportation substantial. However, the defendant in *Shadden* was not charged with simple kidnapping under section 207, subdivision (a), but with kidnapping with intent to commit rape under section 209, subdivision (b)(1). "[T]he standard for proving the asportation element

---

[3] For purposes of this discussion of the third element of the charged offense, I assume that there is no challenge concerning the first two elements of simple kidnapping, that is, forcible, involuntary movement.

of simple kidnapping is not the same as that for aggravated kidnapping." (*People v. Bell, supra*, 179 Cal.App.4th at p. 435.) This is so because, as our Supreme Court has made clear, these two types of kidnapping do not share the same asportation element: "[W]here only simple kidnaping is involved, it is clear that the victim's movements cannot be evaluated in the light of a standard which makes reference to the commission of another crime." (*Stanworth, supra*, 11 Cal.3d at p. 600.) Thus *People v. Shadden* is not pertinent authority for the issue before us.[4] In the other cases cited by respondent, the victims were moved distances of between 29 and 50 feet. Not only are these distances greater than the 15 feet at issue here, but these cases, like *Shadden*, concerned the asportation element of aggravated, not simple, kidnapping.

Respondent adds: "Furthermore, as the prosecutor argued, [defendant's] movement of Luna further into the building and into Luna's apartment increased the risk of harm to Luna by decreasing the risk of detection and making escape more difficult. (*People v. Martinez, supra*, 20 Cal.4th at p. 237.)" However, respondent provides no analysis for this conclusion: How did the "risk of detection" change based on Luna's movement from the front door of the apartment building to the threshold of his family's apartment? And what was at risk of being detected? Defendant was not moving through the building and apartment stealthily to avoid being detected, but was vociferously announcing his presence and his interest in finding members of a certain gang. How was Luna's ability to escape affected by reason of the movement? Luna's action in closing the apartment door suggests that he had no thought of "escaping," and defendant's immediate ascent of the interior stairs once he entered the apartment made Luna's escape easier, not more difficult. Respondent cites no evidence to support its contention that Luna was placed at increased risk of harm, but relies on imagined possibilities of what could have, but did not, happen. The majority endorses this use of speculation when it states that Luna's movement into his apartment rendered it "less likely defendant would have been detected if he had committed an additional crime." (Maj. opn., *ante*, at p. 1435.) However, it is undisputed that defendant committed no crime inside the apartment. We are required to confine ourselves to the evidence presented at trial and the reasonable inferences to be drawn therefrom.

---

[4] The court in *Shadden* found the nine feet at issue substantial based on the fact that the defendant did not need to move the victim in order to rape her, and thus the movement was not "incidental" to the rape. This analysis has been rejected by subsequent appellate courts, based on the differing constructions of the word "incidental." (See, e.g., *People v. Hoard* (2002) 103 Cal.App.4th 599, 607 [126 Cal.Rptr.2d 855].) Because simple kidnapping has no other offense as a referent, it is particularly difficult to apply the analysis of asportation for aggravated kidnapping to a simple kidnapping case.

A review of the kidnapping cases reveals that asportation can increase the risk of harm to the victim in one of distinct two ways: The movement itself can be dangerous, or the result of the movement can increase the victim's risk of harm. In the former circumstance, for instance, where the defendant transports the victim in a motor vehicle, there is the inherent risk of a collision or the possibility that the victim will attempt to escape from the moving car. In such cases of inherently dangerous movement, "[t]he fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased." (*People v. Rayford, supra*, 9 Cal.4th at p. 14.)

More often, the risk of danger is increased by the movement of the victim to a more secluded location, which increases the likelihood that the defendant will be able to achieve his criminal intentions, whether they be rape, robbery, assault, or another crime, without interruption or detection. (See, e.g., *Caudillo, supra*, 21 Cal.3d 562 [movement to storage closet and then to the victim's apartment]; *People v. Shadden, supra*, 93 Cal.App.4th 164 [movement to backroom of store]; *People v. Jones* (1999) 75 Cal.App.4th 616 [89 Cal.Rptr.2d 485] [movement into parked car]; *People v. Smith* (1995) 33 Cal.App.4th 1586 [40 Cal.Rptr.2d 31] [movement into camper]; *People v. Salazar* (1995) 33 Cal.App.4th 341 [39 Cal.Rptr.2d 337] [movement through motel room into bathroom].) In these cases, where the defendant moves the victim in order to harm him or her in private without interruption, it is of course irrelevant if the defendant is prevented, by circumstances unforeseen by him, from harming the victim.

Here, respondent does not contend that the movement itself—several strides through the apartment's hallway—was inherently dangerous. Rather, it maintains that the result of the asportation—placing Luna "further into the building and inside his apartment"—"increased the risk of harm to Luna by decreasing risk of detection and making escape more difficult." This supposes, however, that defendant moved Luna with the intention of harming him. There is no evidence to support this supposition. Rather, the only reasonable inference to be deduced from the evidence is that defendant's sole purpose in moving Luna into the apartment was to determine whether any TMC gang members were present. While Luna might have been put at increased risk of harm if such persons had been present, because they were not (a fact known to Luna), the movement did not, in fact, increase the risk of harm to Luna.

I conclude that, given the totality of the circumstances, including the very short distance involved, the fact that Luna simply walked down the hall, and the absence of evidence of an increased risk of harm, the asportation was not

substantial for purposes of section 207, subdivision (a). (*Martinez, supra*, 20 Cal.4th at p. 237.) In addition, as explained above, I find no substantial evidence of forcible movement. Consequently, I would reverse the kidnapping conviction.

Appellant's petition for review by the Supreme Court was denied July 13, 2011, S192739.