Filed 12/9/22  P. v. Jimenez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D080923 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1902202) |
| ANTHONY DAVID JIMENEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Stephen J. Gallon, Judge.  Affirmed.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Minh U. Le, Deputy Attorneys General for Plaintiff and Respondent.

## INTRODUCTION

After his brother refused to loan him $40, Anthony Jimenez became angry and attacked his 64-year-old stepfather, Dale B., "scalp[ing]" his head and cutting his face with a knife. Jimenez then knocked Dale down and began tying up Dale with duct tape. Dale broke loose and told Jimenez, "[W]e're gonna get in the truck and go get your money and you can stop all this." Despite bleeding profusely from his head and face injuries, Dale drove Jimenez five miles to a bank ATM to withdraw the money Jimenez wanted— all while Jimenez held the knife to Dale's throat. A jury convicted Jimenez of kidnapping to commit robbery (Pen. Code,[1] § 209, subd. (b)(1)), among other felony charges. Jimenez argues his aggravated kidnapping conviction must be reversed, asserting there was insufficient evidence that he used force to move Dale because Dale voluntarily consented to going to the ATM. We conclude Jimenez's argument has no merit, and so we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### *Trial*

A. *Prosecution's Case*

When Dale married Rosemary B., he became the stepfather of her three young boys, ages three, five, and seven. He raised the boys, including Jimenez, as his own and did everything a father would do with his sons, including coaching their sports teams. Dale and Rosemary were married 36 years at the time of trial.

Jimenez, who was in his late thirties, had been living with Dale and his mother off and on for most of his life. One morning in May 2019, Dale went

---

[1] All further statutory references are to the Penal Code.

with Jimenez to help Jimenez buy a car. Later that day, Jimenez drove the car to his brother's house to show it off.

When Jimenez returned home later that evening, only Dale was home because Rosemary was away on a trip. Jimenez told Dale he needed a $40 loan from his brother but his brother said he did not have the money. During the conversation, Jimenez "turned into another person" and became enraged with Dale. Jimenez yelled at Dale about needing the $40, and accused Dale of cheating on Jimenez's mother and watching Jimenez's adult film videos. None of this made sense to Dale.

Jimenez then went to his bedroom, returned with a knife, grabbed Dale, and started to "scalp" him. He grabbed Dale by his hair, pulled back the skin of Dale's scalp, and began cutting it with his knife. Dale "let him because [he] didn't want to fight back." At this point, the prosecutor observed Dale "becoming emotional" in his testimony and Dale agreed. In the attack, he punched Dale in the face, and cut his nose and ear. As Dale's head bled onto his face and obstructed his vision, Jimenez kept yelling at Dale and asking him for the $40. Dale told Jimenez he did not have the money.

Dale then went into the bathroom to clean up his face and to try to stop the bleeding. But Jimenez followed him into the bathroom. Dale "got a little mad" and told Jimenez, "[C]ome on, . . . let's go get you some money so that you can stop being angry." When the prosecutor asked Dale if he was afraid of what was happening and how Jimenez was behaving, Dale said that he "wasn't really afraid." He was "just trying to keep [Jimenez] calm," and thought perhaps Jimenez had cut him "by accident." The prosecutor asked Dale, "So while everything that's going on at the house, him using a knife to your head, punching you and cutting other parts of your face, at that point

3

you didn't believe he was going to kill you?" Dale responded, "I don't want to think that."

Dale left the bathroom and tried to get to his truck in the garage. Again, Jimenez followed him. In the garage, Jimenez knocked Dale down and tried to tie him up with duct tape. He tried to put duct tape around Dale's head and his mouth. He put duct tape around Dale's wrist, but Dale "broke loose." Dale got up and said, "[Y]ou know what, we're gonna get in the truck and go get your money and you can stop all this." Dale was "hoping" that by taking Jimenez to the ATM to get "his money," he could get Jimenez to "calm down and do whatever he needed to do with the $40." He agreed with the prosecutor he was "hoping that by doing this the violence would end." So he "persuaded" Jimenez to get in the truck, and go with Dale to the ATM to withdraw the $40.

When they got into Dale's new truck, Dale sat in the driver's seat and Jimenez sat directly behind Dale. Dale drove Jimenez to his bank's ATM. During the five-mile drive to the ATM, Jimenez held the same knife he used to cut Dale's head against Dale's throat. Jimenez " 'kept slapping' " him with the knife and at one point, he grabbed Dale's hair and pulled Dale back. Dale does not know how he was able to drive because he was still bleeding from his head and face injuries. Still, Dale claimed he was not afraid for his life at this point.

When they reached the drive-through ATM, with the knife still at his neck, Dale withdrew $40 from his account and gave it to Jimenez. After Dale handed him the money and they were on their way home, Jimenez took the knife away from Dale's neck. Dale was concerned about his bleeding head injury and believed he needed to get to a hospital.

4

Halfway home, Jimenez "all of a sudden" began crying and asked Dale what had happened to cause Dale's bleeding. Dale "kept [his] composure" and "played it off," telling Jimenez, "Oh, I just bumped my head on . . . the thing." When they arrived home and got out of the truck, Dale deliberately let Jimenez lead the way to the house. Once Jimenez was about five or six feet in front of him, Dale jumped back into his truck and "took off" for the hospital. Dale did not go to the hospital with Jimenez because he felt he "needed to get away from him" and "let him cool down." Dale explained he was "[a] little" afraid of Jimenez, at this point.

As Dale drove away, Jimenez got into his own car and cut off Dale in the street. Jimenez jumped out of his car, approached Dale in his truck, and asked, "[W]hat do you think you're doing?" Dale put his truck in reverse, knocking Jimenez down, made a U-turn, and started driving back toward the house. But Jimenez got back in his car and used it again to cut off Dale at the other end of the street. Dale made a three-point turn and started driving away. Dale thought he had left Jimenez when suddenly Jimenez rammed his car into Dale's truck. Dale explained, at this point, he "got scared." Jimenez tried to ram him again, so Dale "punched" the gas and got away.

At the emergency room, Dale received 13 stitches to the cut on his head. He had multiple cuts on his nose, cheek, and head.

During Dale's testimony, the prosecutor entered 13 photographs into evidence.[2] Exhibits 1 and 2 are photographs of Dale at the ATM with blood coming down his face from his injuries. Exhibits 3, 4, and 6 are photographs of Dale's head and facial injuries taken at the emergency room. Exhibit 3 shows Dale's scalp, with blood on the left side of his head where Jimenez

---

[2]    We requested these exhibits from the Superior Court and have reviewed them in deciding this appeal.

5

"scalped" him, and a cut to his nose. Exhibit 4 shows Dale's face with a cut to the front of his nose. Exhibit 6 shows the 13 stitches to Dale's scalp. Exhibits 7 and 8 show the interior of Dale's truck with blood, including on the steering wheel and gear shift. Exhibit 9 shows damage to the back of Dale's truck. Exhibits 12 and 13 show a used length of duct tape and a roll of duct tape with blood.

When the prosecutor asked the trial court for permission to publish the photographs to the jury by showing them on Dale's monitor, Dale repeatedly objected. He asked the court, "Is [the prosecutor] gonna put that up there?" and when the court said yes, Dale stated: "I don't want to watch." When the prosecutor attempted to publish Exhibit 12, the photograph of the duct tape, on his monitor, Dale told her, "Don't put that on there." The court explained, "I know this is difficult, but you will have to answer questions." Dale responded, "She was trying to turn the monitor on, and I don't want the monitor on."

Dale acknowledged that reporting Jimenez's attack on him has caused "friction" with his wife Rosemary and she has been upset with him. He explained: "I'm the stepdad. She's the biological mother. And we both love Anthony. But, yes, it's been quite a struggle knowing that we had this incident." Dale admitted it was "very true" that he did not want to be in court.

B.    *Defense Case*

Jimenez called his mother, Rosemary, and his aunt in his defense. Rosemary testified that she suspected Jimenez had a mental illness in 2019 because she had heard him talking to himself. Rosemary also testified that she had observed Jimenez "slugging" himself in the head. Jimenez's aunt testified that over the period of 2014 to 2019, she thought Jimenez had a

6

mental illness because "his entire persona changed like a switch"; she saw him talking to himself; and she noticed that he talked about people following him, trying to kill him, and trying to take his money.

## II.

### *Verdict and Sentencing*

After deliberating for less than one day, the jury convicted Jimenez on the four charged counts: kidnapping to commit robbery (§ 209, subd. (b)(1); count 1); assault with a deadly weapon (§ 245, subd. (a)(1); count 2); first degree robbery (§§ 211, 212.5, subd. (b); count 3); and resisting a peace officer (§ 148, subd. (a)(1); count 4). As to counts 1 and 4, the jury found true that Jimenez used a deadly and dangerous weapon, a knife, in the commission of those offenses. (§§ 1192.7, subd. (c)(23), 12022, subd. (b)(1)). The jury also found it true that Jimenez personally inflicted great bodily injury on the victim in the commission of the aggravated kidnapping (§§ 1192.7, subd. (c)(8), 12022.7, subd. (a)).

In a bifurcated proceeding, Jimenez admitted a prior strike conviction (§§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1), which the trial court dismissed on Jimenez's *Romero*[3] motion under section 1385.

The trial court sentenced Jimenez to a total prison term of three years plus seven years to life, consisting of: an indeterminate term of seven years to life for kidnapping to commit robbery conviction (count 1) plus a consecutive term of one year for the associated dangerous weapon enhancement; a concurrent, low term of two years for the deadly weapon assault conviction (count 2); a consecutive, low term of 2 years on the first degree robbery conviction (count 3); and a concurrent jail term of 180 days for

---

[3] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

the resisting a peace officer conviction (count 4). The court imposed and struck the punishment for the remaining enhancements.

DISCUSSION

On appeal, Jimenez challenges only the sufficiency of the evidence to support his conviction for kidnapping to commit robbery, or aggravated kidnapping. In evaluating his claim, we review the entire record in the light most favorable to the prosecution and determine whether it contains substantial evidence from which a reasonable trier of fact could find Jimenez guilty beyond a reasonable doubt. (*People v. Rountree* (2013) 56 Cal.4th 823, 852–853 (*Rountree*).) We presume the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment (*People v. Jackson* (2014) 58 Cal.4th 724, 749), and we do not substitute our judgment for that of the jury or reverse merely because the evidence might also support a different finding (*People v. Hill* (1998) 17 Cal.4th 800, 849).

Under California law, a person is guilty of kidnapping if he or she "forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county[.]" (§ 207, subd. (a).) The crime of kidnapping requires that "the victim's movement must be accomplished by force or any other means of instilling fear" (*People v. Majors* (2004) 33 Cal.4th 321, 326–327 (*Majors*)), and the movement must be without the victim's consent (*Rountree, supra*, 56 Cal.4th at p. 852). "[T]he concepts of consent and force or fear 'are clearly intertwined' " (*Majors*, at p. 327), and there can be no kidnapping "[i]f a person's free will was not overborne by the use of force or the threat of force" (*People v. Hill* (2000) 23 Cal.4th 853, 856 (*Hill*)). And when the kidnapping is committed for robbery, the offense is aggravated kidnapping and subject to

8

the greater punishment of life imprisonment with the possibility of parole. (§ 209, subd. (b)(1); see *People v. Curry* (2007) 158 Cal.App.4th 766, 778–779.)

Here, the trial court correctly instructed the jury that to prove Jimenez guilty of kidnapping for the purpose of robbery under section 209, subdivision (b), the People must prove:

"1.  The defendant intended to commit robbery;

"2.  Acting with that intent, the defendant took, held, or detained another person by using force or by instilling a reasonable fear;

"3.  *Using that force or fear, the defendant moved the other person* [*or made the other person move*] *a substantial distance*;

"4.  The other person was moved or made to move a distance beyond that merely incidental to the commission of a robbery;

"5.  When that movement began, the defendant already intended to commit robbery;

"6.  *The other person did not consent to the movement*;

"AND

"7.  The defendant did not actually and reasonably believe that the other person consented to the movement."  (CALCRIM No. 1203)  (Italics added.)

The jury was further instructed that "[i]n order to consent, a person must act freely and voluntarily and know the nature of the act."  We presume the jury followed the instructions given to it.  (*People v. Case* (2018) 5 Cal.5th 1, 32.)

Despite the extreme violence he inflicted on his stepfather, Jimenez contends there was insufficient evidence that he used force or fear to compel Dale to go to the bank (element 3) or that Dale went against his will (element 6).  He contends this is so because Dale testified "the trip to the bank" was his idea, he was not afraid during the violent ordeal, and that he even had to

"persuade" Jimenez to go. We disagree. Contrary to Jimenez's contention, there was sufficient evidence from which the jury could find both elements 3 and 6 were satisfied.

The evidence established the following. Jimenez "scalped" Dale with a knife, by pulling his hair back and cutting into his scalp. He left a gash in his stepfather's head that required 13 stitches. After inflicting this injury, Jimenez also punched Dale in the face, and cut his nose and ear with the knife. As his stepfather bled down his face, Jimenez said he needed $40 and Dale told him that he did not have the money. Jimenez followed Dale into the bathroom, still holding the knife in anger, at which point, Dale told Jimenez, "[L]et's go get you some money *so that you can stop* being angry." (Italics added.) Jimenez again followed Dale as he tried to get to his car in the garage, and there Jimenez knocked him down and tried to duct-tape his mouth and his wrists. When Dale broke loose, he told Jimenez, "[W]e're gonna get in the truck and go get your money and *you can stop all this*." (Italics added.) Although he claimed to not be afraid in these moments, Dale testified he was "hoping" that by suggesting they go to the bank to get the money, "the violence would end." It did not. Dale drove Jimenez five miles to his bank's ATM, with Jimenez behind him, holding the same knife to his throat. Jimenez slapped him with the knife and, again, grabbed Dale's head by the hair and pulled him back. The photographs of Dale at the ATM showed Dale still bleeding from his head as he withdrew money, which we know from Dale's testimony he did at knifepoint. Only after he got his $40 did Jimenez take the knife away from Dale's neck.

On these undisputed facts, and drawing all reasonable inferences, a jury could reasonably conclude that Dale did *not* suggest and then consent to going to the bank freely and voluntarily. Rather, Dale did so because he felt

10

he had no other choice, or hope, if he were to make the violence end. (See, e.g., *Rountree, supra,* 56 Cal.4th at p. 853 [in kidnapping case, prosecution "aptly argued" that " '[a] person who gets into the car with two total strangers because these people are armed with a weapon is not acting freely and voluntarily' "]; *Majors, supra,* 33 Cal.4th at p. 328 [discussing *People v. La Salle* (1980) 103 Cal.App.3d 139, 146, (disapproved on other grounds in *People v. Kimble* (1988) 44 Cal.3d 480, 496, fn. 12) in which jury could find victim was forced to consent to movement where victim "entered the car not voluntarily, but because the defendant had her [toddler] daughter in the car, and could have driven away with her . . . [thus] she felt she had no choice but to cooperate"].) Indeed, these are the very conclusions the prosecutor argued the jury should draw from the evidence, and the jury's verdict on the aggravated kidnapping count demonstrates they accepted the prosecutor's argument. Under these circumstances, there was sufficient evidence that Dale's free will was overborne by Jimenez's use of force and violence, sufficient for a kidnapping. (See *Hill, supra,* 23 Cal.4th at p. 856.)

We are not persuaded to the contrary by Jimenez's hyperfocus on Dale's testimony that it was *Dale*'s idea to go to the bank, that he was not afraid during the violence, and that he had to persuade Jimenez to go to the bank. It is clear from the record that Dale was a reluctant and conflicted witness. Dale explained his cooperation with law enforcement caused "friction" with his wife, to whom he had been married for 36 years, and that he did not want to be in court testifying against his son. He was still visibly emotional, even nearly two and one-half years later, as evidenced by his objections to seeing the photographic evidence of the trauma he suffered. The prosecutor argued to the jury that Dale "may have said" he voluntarily went to the bank, "but what did we hear?," urging the jury to scrutinize Dale's credibility on that

11

very statement.  The prosecutor argued Dale did not suggest and then drive Jimenez to the bank "freely"; rather, "[h]e did it because of the madness of what was happening to him, what the defendant was doing to him."

On this record, the jury was entitled to disbelieve Dale's testimony that he was not afraid during Jimenez's ongoing attacks, and the jury could reasonably find that Dale was compelled to propose going to the bank out of force or fear.  The jury was properly instructed that it, alone, "must judge the credibility or believability of the witnesses" and that it could "believe all, part, or none of any witness's testimony."  (CALCRIM No. 105; see *People v. Hillhouse* (2002) 27 Cal.4th 469, 497 [witness's credibility was for the jury to determine, not an appellate court].)  Although Dale testified it was his idea to go to the bank and that could support an inference he voluntarily drove to the ATM, a reviewing court is not permitted to reverse "simply because the facts could be reconciled with a finding of innocence."  (*People v. Arias* (2011) 193 Cal.App.4th 1428, 1436 (*Arias*) [in kidnapping case, victim's fear "caused him to be a very reluctant witness," and court reasoned that, although jury could have concluded the victim "simply walked away from defendant and defendant followed [him] to his apartment for a friendly chat," the jury also could have found the opposite, requiring the court to affirm].)

Jimenez next complains that pushing Dale to the garage floor and trying to tie him up with duct tape was "wholly inconsistent" with compelling Dale to go to the bank.  But the prosecution argued that Jimenez changed his plan when he realized he would not be able to get Dale into the truck or have Dale get the money from the ATM if he was tied up.  The prosecution argued the jury should conclude that Jimenez instead decided to get Dale into the truck and hold a knife to Dale's neck to make sure that Dale complied.  Because the prosecution covered this point in closing, the jury clearly rejected

12

the inference that Jimenez advocates here.  (See *Arias*, *supra*, 193 Cal.App.4th at p. 1436; *People v. Bolin* (1998) 18 Cal.4th 297, 331 (*Bolin*) [reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' "].)  As the reviewing court on appeal, we "must accept logical inferences"—like this one—"that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

Moreover, even assuming Dale *voluntarily* proposed going to the ATM to get the money Jimenez wanted, there was sufficient evidence from which the jury could find that any initial cooperation on Dale's part vanished the moment Jimenez held and slapped a knife to Dale's neck and grabbed Dale by the hair as Dale drove to the bank.  Dale testified Jimenez finally put down the knife only after Dale handed him the money.  Thus, the jury could reasonably find that Jimenez prevented Dale from leaving the truck before obtaining the money.  Put another way, there was ample evidence from which the jury could find that Jimenez's use of physical force "vitiated any initial voluntariness, converting the encounter into one in which [Dale] was being transported against [his] will" sufficient to support Jimenez's kidnapping conviction. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1018; *People v. Camden* (1976) 16 Cal.3d 808, 814 [concluding that victim was prevented from leaving the car because of the high rate of speed at which it was being driven and confirming the rule that " '[w]here the victim has at first willingly accompanied the accused, the latter may nevertheless be guilty of kidnap[p]ing if he subsequently restrains his victim's liberty by force and compels the victim to accompany him further' "].)

Jimenez further asserts the record lacks evidence showing that Dale's liberty was ever restrained, such as evidence that Jimenez denied a request by Dale to exit the truck. Jimenez argues that, for this reason, the evidence could *only* show Dale consented to driving to the bank and that Jimenez never "substituted his will" for Dale's. But as we have already discussed, this was not the only conclusion the jury could reasonably draw from the evidence, and the jury was entitled to reject it. (See *Arias, supra,* 193 Cal.App.4th at p. 1436; *Bolin, supra,* 18 Cal.4th at p. 331.) Dale was not required to test Jimenez's resolve—i.e., by asking for permission to stop driving or to get out of the truck—while Jimenez was holding a knife to his throat. (See, e.g., *People v. Power* (2008) 159 Cal.App.4th 126, 137 [threat that victim's family would be harmed if victim did not have sex with defendant was sufficient to establish fear required for kidnapping; although victim might have gone to police or refused to comply, she was not required to "test" the kidnapper to see if he was bluffing].)

Jimenez's reliance on *People v. Stephenson* (1974) 10 Cal.3d 652 does not require a different conclusion. In *Stephenson,* the victims voluntarily got into the defendant's car when he offered to drive them to their destinations, and the defendant later robbed them. Contrary to the present case, the Court of Appeal in *Stephenson* reasoned the victims "were enticed . . . by deceit or fraud" to get into the defendant's vehicle, and thus, there could be no kidnapping because the victims were not "forcibly require[d] . . . to enter his car." (*Id.* at pp. 659–660.) But Jimenez did not use fraud or deceit to fool Dale into getting into his truck and driving them to the bank. Rather, Jimenez and Dale both understood they were going to the bank to get the money Jimenez wanted—only after Jimenez yelled at, beat, scalped, cut, and tried to tie up Dale. This was not consent under *Stephenson.* (See *La Salle,*

14

*supra*, 103 Cal.App.3d at pp. 145–146 [no consent and no mere inducement by fraud or deceit where defendant told mother that if she wanted her child back, she would have to get in defendant's car where the child was being held].)

In sum, we conclude on the record before us that Jimenez has not carried his " 'enormous burden' " of demonstrating insufficient evidence to require reversal of his conviction on the aggravated kidnapping charge. (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1071.)

DISPOSITION

The judgment is affirmed.

DO, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.