Filed 4/30/14  P. v. Allen CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DONALD GUS ALLEN,<br><br>        Defendant and Appellant. | A135839<br><br>(Del Norte County<br>Super. Ct. No. CRF12-9125) |

On March 8, 2012, from about 1:30 to 7:30 a.m., Donald Gus Allen sexually assaulted, physically injured, and threatened his wife, T. N., in a remote area near the beach in Crescent City, California.  At one point, T. escaped Allen and locked herself in her truck, but Allen broke the window and dragged her from the vehicle onto the ground. T. had managed to call her son from inside the truck, but it took him two hours to find and rescue her.  Allen was later arrested near the scene.

Allen was charged with oral copulation by force (Pen. Code, § 288a, subd. (c)(2)),[1] penetration by a foreign object by force or violence (§ 289, subd. (a)(1)), corporal injury to spouse or cohabitant (§ 273.5, subd. (a)), criminal threat (§ 422), false imprisonment by violence (§ 236), and kidnapping (§ 207, subd. (a)).  A jury found Allen guilty on all six counts and the court sentenced Allen to six consecutive terms of 25 years to life.

---

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

Allen contends that his convictions for oral copulation by force and kidnapping were not supported by substantial evidence. We disagree and affirm those convictions.

Allen argues that the jury instruction concerning the asportation element of kidnapping misstated the law and that the prosecutor made a similar misstatement in her closing argument. We conclude that the prosecutor did not misstate the law and that any error in giving the instruction was harmless.

Allen also contends that separate punishment for the crimes of corporal punishment, criminal threat, and false imprisonment violates section 652 because those crimes were merely incidental to the commission of the sexual assaults. We conclude that substantial evidence supports a finding that Allen had an intent or objective separate from the commission of the other crimes with which he was charged when he physically harmed and threatened T. However, we agree with Allen that a finding that he had a separate intent or objective when he detained T. against her will is not supported by substantial evidence. Accordingly, we modify the judgment to stay the sentence imposed for false imprisonment.

Finally, Allen contends that the trial court erred by failing to grant him credits for time served and for conduct. The People agree, as do we. We modify the judgment to specify the appropriate credits.

## BACKGROUND

### I. *Procedural Background*

On May 17, 2012, the People filed an amended information charging Allen with the following crimes against T.: (1) oral copulation by force (§ 288a, subd. (c)(2)) (count 1); (2) penetration by a foreign object by force or violence (§ 289, subd. (a)(1)) (count 2); (3) corporal injury to spouse or cohabitant (§ 273.5, subd. (a))[2] (count 3); (4) criminal threat (§ 422) (count 4); (5) false imprisonment by violence (§ 236) (count 5); and (6)

---

[2] The heading of count 3 cites section 273.5, subdivision (e), but this appears to be a typographical error. Subdivision (a) states the actual offence with which section 273.5 is concerned and the body of count three does not mention subdivision (e), which is irrelevant to the facts of this case.

2

kidnapping (§ 207, subd. (a)) (count 6). The information alleged that all counts except count 5 were serious felonies within the meaning of section 1192.7, subdivision (c). In addition, the information made the following special allegations: (1) four prior felony convictions resulting in prison terms (§ 667.5, subd. (b)); (2) a prior serious conviction within the meaning of section 667, subdivision (a); and (3) two prior strike convictions (§§ 1170.12, 667, subds. (b)-(i)).

A jury trial began on May 21, 2012. On May 24, 2012, the jury found Allen guilty on all counts. Later that day, Allen waived trial by jury on the special allegations. On the People's motion, the court dismissed one of the section 667.5, subdivision (b), allegations of a prior conviction resulting in a prison term. The court found the remaining prior convictions and special allegations to be true.

On June 21, 2012, the court sentenced Allen to six consecutive terms of 25 years to life, plus seven years based on the special allegations, for an aggregate sentence of 157 years to life.

On June 26, 2012, Allen timely filed a notice of appeal.

**II. *Factual Background***

Allen and T. were married on April 26, 2011, but began living together in November 2009.

**A. *Dale Silvey's Account of T.'s Rescue***

Dale Silvey, T.'s son, received a call from his mother at 5:28 a.m. on March 8, 2012. Silvey heard his mother say, "Help me, Bud. I'm at the Shores."[3] T. sounded scared and distressed. Silvey understood "the Shores" to mean Pacific Shores, an area off Kellog Road in Crescent City, near the beach and about a mile to a mile and a half from Allen's and T.'s home. Silvey, his girlfriend, Annie Dixon, and their two children drove to Pacific Shores to investigate.

Silvey drove along the roads of Pacific Shores for about two hours before finding T.'s Toyota 4-Runner truck parked on the road. The driver's side window was broken

---

[3] Silvey testified that "Bud" was a nickname that T. used for him.

and Silvey saw clumps of hair soaked in blood. Clothing was in the road, 100 to 150 feet from the Toyota.

Silvey observed Allen on top of T. in the brush, 10 to 15 feet away from the Toyota. Allen was in a kneeling position, holding a blue coat over T., who was lying on her side in a fetal position. When he saw Silvey, Allen, who was wearing nothing except a T-shirt, ran to the Toyota.

Silvey and Dixon approached T., who was huddled in the coat and crying. T. asked Silvey and Dixon for help and to take her away. She had twigs and sticks in her hair and a bald spot. She also had scrapes, bruises and blood, mostly dried, on her face and legs.

Silvey and Dixon picked up T.'s clothing and drove her back to her house. As Silvey drove, T. was shaking and crying, trying to cover up and hide her face. Dixon called 911 from T.'s house.

The police arrived and T. made a statement to Officer Jerrin Gill. Silvey drove back to where T.'s Toyota was parked and another officer followed him. When Allen saw them coming, he left the Toyota and ran into the brush. The police later found Allen lying in the brush and took him into custody.

**B.** *T.'s Statement to the Police and Medical Examination*

A video recording of T.'s statement to Gill was played for the jury at trial. Gill asked T. what happened and T. replied: "Just drove us out there. I don't know, like I said before. He just drove us out there. Uhm, I don't know. We just, he just kept me out there. And took me out into the woods or whatever. Out into the brush. He, right. He proceeded to take my clothes off. My shoes, threw them. My pants, ripped my pants off me. My clothes. Kept me out there. Uhm, sodomized me. Uhm, tried smothering me, killing me, choking me. Uhm ripping my insides from the inside out. Uhm, just I don't know, he just goes crazy. He's just trying to kill me. Basically, trying to kill me and hurt me. Rape me. Wanting me to, uhm, do, give him oral sex or whatever. Tried to force me to give him oral sex. Just kept me out there."

4

T. said that Allen had taken her to Pacific Shores about 1:00 or 1:30 in the morning. Allen hit her with "chunks of wood" that were on the ground and tried stuffing rocks into her mouth. When they arrived at Pacific Shores, Allen "basically drug me out of the car. Had me out on the ground. Drug me outta the car. Tried to, you know, force me to give him oral sex." Allen then "proceeded to rip my clothes off. Threw my shoes out in the brush." T. continued: "He took my shoes, threw them out. He ripped my pants off. My underwear. He, uhm. He inserted his hands inside my insides. [¶] He forced his fingers in to my rectum and was pulling on my insides. [¶] He tried smothering me and choking me."

T. said that Allen tried choking her with his hands and smothering her with his jacket. She reached the point that she couldn't breathe because of what Allen was doing. T. was begging Allen to stop and yelling for help. She believed that Allen had stuffed debris inside of her.

At one point Allen's pants were down and T. was able to get back into the Toyota. T. wanted to drive away, but was unable to start the vehicle. She locked the doors and made a phone call, but Allen broke the driver's side window. T. told Gill: "He's done this to me, he's taken me out there before. He's taken my phone, he's been taking clothes and leaving me out there. (unintelligible) but this is the worst time he's raped me. This is the worst."

T. was taken to the hospital where she was treated by Dr. George Isenhart. T. told Isenhart that she had been assaulted, had been beaten with sticks and fists, and had been assaulted vaginally and rectally. Isenhart noted tenderness on T.'s scalp, neck, abdomen and sacrum. T. had bruises on her back, thighs, and legs and abrasions on her buttocks. Isenhart observed rectal tenderness and a hemorrhoid that could have been caused by Allen inserting his fingers into her rectum and pulling.

## C. *Allen's Phone Calls from Jail*

Recordings of 11 phone calls that Allen made from jail were played for the jury at trial. In one call, Allen told T. to inform Silvey and Dixon that they could have his Jeep if they did not testify. Allen told T.: "[W]e were asleep when [Silvey and Dixon]

5

showed up." In another call, Allen told T. to talk to an attorney "and see what he says about if you can change your story." In yet another conversation, Allen told T., "[I]f you go down and change your statements I wouldn't have to worry about being gone that long. You have to do it before I fucking—before we start going to court, though. [¶] Just walk in and tell them we were on fucking crystal meth and we were drunk and on pain pills. . . . [¶] You could get an attorney and go down and change your statements. Just tell them everything was consensual and there ain't nothing they can do but drop the charges."

T. also told Allen in the telephone conversations about what he did to her during the night in question: "Yeah, my head, the whole right top of my head is completely bald from where you pulled all my hair out. . . . My whole back side is just road rash from you dragging me around." She told Allen that he caused her "permanent damage," that he "[p]ulled [her] rectum inside out" 10 times, and that he "[slugged her in her] stomach as hard as [he] could" four times.

**D.** *T.'s Testimony at Trial*

At trial, T. testified that when she spoke to Gill, "I believe what I told him was what I felt was the truth, but exaggerated." Before driving to Pacific Shores on the night in question, she and Allen drank a half-gallon bottle of whiskey and used methamphetamine. She said that she and Allen drove to Pacific Shores to make out and talk and that they were there between four and six hours. They did not have sexual intercourse and Allen never forced her to do anything that was sexual in nature.

At one point, T. went back to the truck because she was cold and didn't want to be outside any longer. When she entered the truck, she locked the doors because she was thinking about leaving Allen there. She also locked the doors so she would have time to make a phone call to her son. She did not have the key to the truck and she needed help from her son to find the keys and get a ride home. Up to that point, Allen had not been angry with her, but she felt scared being there in the dark and Allen "was in some hallucinatory state of mind thinking there was other people out there that were going to . . . get me or him." Allen was talking to people she couldn't see and this started about an

6

hour before she got into the truck.  Allen banged on the window of the truck and then broke it.  T. exited the truck from the passenger side; Allen did not force her.  T. began looking for her clothes so she could get dressed and "get out of there."  Allen came around to her and they laid down on the ground.  She and Allen "stayed close to each other, lying on the ground next to the truck" until Silvey found them.  Allen never forced her to do anything that night.  The only thing to which T. did not consent was being at Pacific Shores for four to six hours.  T. was unsure if Allen inserted his fingers into her rectum that night  At one point that night, T. gave Allen oral sex, but it was consensual.  T. denied that Allen ripped her clothes off, raped her, smothered her, choked her, put rocks in her mouth, or threatened to kill her.

## DISCUSSION

### I.  *Sufficiency of the Evidence*

Allen contends that insufficient evidence supports his convictions for oral copulation by force and kidnapping.  We disagree.

### A.  *Legal Standard*

" 'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]  [¶]  Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]  Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.  [Citations.]' " (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206, quoting *People v. Jones* (1990) 51 Cal.3d 294, 314.)

"Substantial evidence is defined as 'evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.' " (*People v. Whalen* (2013) 56 Cal.4th 1, 55.)

## B. *Oral Copulation by Force*

Oral copulation by force requires proof of an "act of oral copulation . . . accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." (§ 288a, subd. (c)(2)(A).) Allen contends that insufficient evidence supports his conviction for forcible oral copulation because "[T.'s] pretrial statement to the police did not describe any conduct by [Allen], from which the jury could have rationally inferred that [Allen] used force or any of the other methods proscribed by section [288a, subdivision (c)(2)] to complete the act of oral copulation." T.'s trial testimony, on the other hand, "was that she performed oral sex voluntarily."

T. testified that at one point during the night in question she performed oral sex on Allen. In her earlier statement to police, T. did not say that an act of oral sex had been completed, but she said more than once that Allen tried to force her to perform oral sex. It was up to the jury to determine what to believe from T.'s trial testimony and what to believe from the earlier statement to the police. Here, the jury could reasonably conclude that an act of oral copulation had been completed, because it was clear that T. meant her testimony to exonerate Allen and there would have been no reason for her to fabricate an act of oral sex. But the jury could also have reasonably concluded that Allen forced T. to perform the act. Gill testified that when T. spoke with him, she appeared to have a clear memory of what had happened, even though she seemed traumatized.

Allen argues that "the statement that [Allen] tried to force [T.] to give him oral sex is not enough. This statement is devoid of evidentiary value since it does not actually describe what appellant said or did and does not describe a completed act. Instead, [T.] merely described her own conclusion regarding what [Allen] supposedly wanted her to do. Such a statement does not amount to evidence of ponderable legal significance

8

sufficient to support the judgment on appeal." In so arguing, Allen ignores reasonable conclusions the jury could have drawn from T.'s statement to the police.

Allen told the police: "He proceeded to take my clothes off. My shoes, threw them. My pants, ripped my pants off me. My clothes. Kept me out there. Uhm, sodomized me. Uhm, tried smothering me, killing me, choking me. Uhm ripping my insides from the inside out. Uhm, just I don't know, he just goes crazy. He's just trying to kill me. Basically, trying to kill me and hurt me. Rape me. Wanting me to, uhm, do, give him oral sex or whatever. Tried to force me to give him oral sex. Just kept me out there." This passage describes several specific acts of force perpetrated by Allen on T.'s person which the jury could reasonably interpret as intended to force T. to perform oral sex. The jury could also conclude that when T. did perform oral sex, it was due to Allen's use of force.

Substantial evidence supports Allen's conviction for forcible oral copulation.

## C. *Kidnapping*

Allen was charged with a violation of section 207, subdivision (a): "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." "[T]he prosecution must generally 'prove three elements: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance.' [Citation.] This last element, i.e., that the victim be moved a substantial distance, is called the 'asportation' element." (*People v. Bell* (2009) 179 Cal.App.4th 428, 435.)

It was the People's theory that Allen committed kidnapping by the act of taking T. from the Toyota, after he had broken its driver's side window, to a location in the brush, 10 to 15 feet away, where Allen and T. were later found by Silvey. Allen contends that insufficient evidence supports a finding of the asportation element of kidnapping.

To satisfy the asportation element, "the movement must be 'substantial in character.'" (*People v. Martinez* (1999) 20 Cal.4th 225, 235.) Determining whether

9

movement is substantial in character "arguably should include some consideration of the 'scope and nature' of the movement or changed environment, and any increased risk of harm." (*Id.* at p. 236.)  Factors contributing to a finding of an increased risk of harm include:  (1) diminished likelihood of discovery; (2) the opportunity for the commission of additional crimes; and (3) the possibility of injury from foreseeable attempts to escape. (*Ibid.*)  Nevertheless, "[w]hile the jury may consider a victim's increased risk of harm, it may convict of simple kidnapping without finding an increase in harm, or any other contextual factors.  Instead, as before, the jury need only find that the victim was moved a distance that was 'substantial in character.' " (*Id.* at p. 237.)  Moreover, "contextual factors, whether singly or in combination, will not suffice to establish asportation if the movement is only a very short distance." (*Ibid.*)

Allen first argues that 10 to 15 feet is a very short distance, legally insufficient to support asportation.  In *People v. Arias* (2011) 193 Cal.App.4th 1428, 1435 (*Arias*), the court affirmed a kidnapping conviction in which the victim was moved 15 feet. Although, as Allen points out, the victim in *Arias* was moved at gunpoint away from a public area into the seclusion of a private apartment (*id.* at pp. 1434-1435), and *Arias* can be distinguished on that basis, the case is precedent that a movement of 15 feet can be enough to support the asportation element.  Allen relies on the fact that Justice Armstrong, in dissent, called the 15-foot distance at issue in *Arias* "very short." (*Id.* at p. 1447 (dis. opn of Armstrong, J.).)  However, Justice Armstrong's dissenting conclusion was based on the "totality of the circumstances," which included not only "the very short distance involved," but also "the fact that [the victim] simply walked down the hall, and the absence of evidence of an increased risk of harm." (*Id.* at pp. 1447-1448.)

The California Supreme Court has ' "resisted setting a specific number of feet as the required minimum distance.' " (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1155.) In *Martinez*, the court noted:  "[A]s we have historically recognized for both aggravated and simple kidnapping, limiting a trier of fact's consideration to a particular distance is rigid and arbitrary, and ultimately unworkable." (*Martinez*, *supra*, 20 Cal.4th at p. 236.)

10

We decline to do what our Supreme Court has resisted doing and will not conclude that, as a matter of law, a movement of 10 to 15 is insufficient to support asportation.[4]

Allen next argues that even if 10 to 15 feet is not legally insufficient to support a conviction for simple kidnapping, none of the contextual factors that a jury may consider, under *Martinez*, supports a conviction. Among the contextual factors that a jury may consider is the opportunity for the commission of additional crimes. Allen contends that movement from a more secluded area (the interior of the Toyota) into a more open area decreased the opportunity to commit other crimes. We disagree.

The jury could reasonably have found that by taking T. out of the truck and placing her on the ground in the brush, T. had a greater opportunity to commit a variety of assaults. Outside of the truck, Allen had ready access to the debris on the ground, which he "stuffed" inside T. By laying T. on the ground, free from obstructions, and lying on top of her, Allen was better positioned to injure T.'s rectum and to "smother" and "choke" her. Had T. remained in the Toyota, a jury could reasonably believe that Allen, encumbered by the interior of the vehicle, may not have been able to accomplish such assaults. We conclude that substantial evidence supports a finding that Allen had a greater opportunity for the commission of additional crimes after moving T.

Because substantial evidence supports one of the contextual factors that a jury may consider, we conclude that substantial evidence supports Allen's conviction for simple kidnapping.

## II. *Instruction Concerning Asportation*

---

[4] The People rely on *People v. Shadden* (2001) 93 Cal.App.4th 164, 169, in which the distance at issue was nine feet. However, as Justice Armstrong pointed out in his *Arias* dissent: "[T]he defendant in *Shadden* was not charged with simple kidnapping under section 207, subdivision (a), but with kidnapping with intent to commit rape under section 209, subdivision (b)(1). '[T]he standard for proving the asportation element of simple kidnapping is not the same as that for aggravated kidnapping.' [Citation.] This is so because, as our Supreme Court has made clear, these two types of kidnapping do not share the same asportation element. . . . [Citation.] Thus *People v. Shadden* is not pertinent authority for the issue before us." (*Arias*, *supra*, 193 Cal.App.4th at pp. 1445-1446 (dis. opn. of Armstrong, J.).)

11

The court orally instructed the jury as follows: "Substantial distance means more than a slight or trivial distance. [¶] In deciding whether a distance was substantial, you must consider all the circumstances related to the movement. Thus, in addition to considering the actual distance moved, you also must consider other factors such as whether the movement increased the risk of physical or psychological harm, increased the danger of the foreseeable escape attempt, gave the attacker a greater opportunity to commit additional crimes, or decreased the likelihood of detection." Written instructions were provided to the jury and they differed in using the words "you may consider," rather than "you also must consider," before listing the contextual factors. The written instruction matches the part of CALCRIM No. 1215 that deals with asportation.

Allen did not object to the oral or written version of the instruction. However, Allen now argues that the instruction is flawed in the following ways: (1) both the written and oral instruction require the jury to consider all the circumstances, even though the jury is permitted to determine the issue based on the actual distance alone; (2) the oral instruction required the jury to consider the contextual factors; and (3) the instruction does not convey that if the victim was moved for a very short distance, contextual factors are not enough to establish that the movement was for a substantial distance. We consider the issue on the merits because Allen also raises the issue under the rubric of ineffective assistance of counsel.

We first consider whether it was error to instruct the jury that in determining whether a distance is "substantial," the jury *must* consider all of the circumstances. The *Martinez* court stated that an instruction that "the jury *should* consider the totality of the circumstances" would be proper. (*Martinez*, *supra*, 20 Cal.4th at p. 237, italics added.) However, the court also stressed that the jury must find that the distance is " 'substantial *in character*.' " (*Ibid.*, italics added.) When the distance involved is large enough that no reasonable person would question that it is substantial in character, other circumstances may be irrelevant, but a defendant could not then be prejudiced by an instruction that the jury must consider all of the circumstances. But when, as here, the distance is not so large, it is not possible for a jury to determine if the distance is substantial "in character"

12

without considering evidence other than the distance alone and it is not error to instruct the jury that it must consider all of the circumstances. The bench notes for CALCRIM 1215 capture this distinction between distances that are facially substantial and those that are not by providing that the contextual factors listed in the instruction may be omitted "in the case of simple kidnapping, if the movement was for a substantial distance." We conclude that it was not error for the court to instruct the jury that it must consider the totality of the circumstances because the distance involved in this case was not so large that the jury, without considering more than distance, could conclude that it was "substantial in character."

We next consider the issue of the difference between the oral version of the instruction (requiring the jury to consider the contextual factors) and the written version (permitting but not requiring the jury to consider the contextual factors). " 'To the extent a discrepancy exists between the written and oral versions of the jury instructions, the written instructions provided to the jury will control.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 746 (*Edwards*).)

The *Martinez* court wrote that consideration of factors other than actual distance "should apply in *all* cases involving simple kidnapping." (*Martinez, supra*, 20 Cal.4th at p. 235, italics added.) It is true that the court observed that "contextual factors, whether singly or in combination, will not suffice to establish asportation if the movement is only a very short distance" (*id.* at p. 237), but the court did not imply that it would be improper, in such a case, for the jury to consider the contextual factors.[5] Because it is

---

[5] Allen argues that the instruction did not inform the jury that "when the distance of movement is too brief, contextual factors alone cannot establish movement for a substantial distance." Nothing in *Martinez* implies that the court has a duty to so inform the jury and we believe that such an instruction would needlessly confuse the jury. CALCRIM No. 1215 correctly informs the jury that a substantial distance is one that is more than slight or trivial. To go further and instruct the jury that the contextual factors are not relevant if the distance is "very short" would leave the jury without objective guidance about when it should and should not consider contextual factors. We take the court's observation concerning the irrelevance of contextual factors when the distance is

13

never improper for a jury to consider the contextual factors, the difference between the oral and written versions of the instruction presents "no 'reasonable likelihood the jury applied the challenged instruction in an impermissible manner.' " (*Edwards*, *supra*, 57 Cal.4th at p. 746.)

### III. *Prosecutor's Argument Concerning Asportation*

In closing argument, the prosecutor addressed the jury concerning asportation as follows:  "And, specifically, this crime—I just kind of want to focus on 'substantial distance.'

"I think when people think about kidnapping they think you snatch somebody from one town and take them to another or something like that.

"The instruction tells you that it's not a slight or trivial distance, and some people might think:  Well, 10, 15, 20 feet, that's slight or trivial, that's not enough of a distance.  And I tell you that's not true.

"In this case the—they give you factors to consider, and these are in the jury instructions.

"It's not just the actual distance to consider.  The—you have to consider all of the circumstances.

"Did the movement increase the risk of harm?  And I pose to you that it absolutely increased the risk of harm.

"Prior to him breaking out the window and dragging her out and over in the brush, she had reached a relative place of safety locked in a car.  She had put some distance between herself and her attacker.

"He, by breaking the window and dragging her out and dragging her to a place that was even a little more remote than where they were to begin with, which is Pacific Shores, which is very remote, he took her to a place that really increased the risk of harm to her.

"It was more easy for him to assault her while she was out there in the brush.

---

"very short" to be guidance for trial courts in determining whether a charge should be submitted to a jury and for appellate courts in evaluating sufficiency of the evidence.

"It would have been much more difficult for him to continue assaulting her in the car, and especially if she were locked in with the window intact.

"Additionally, there was an increased danger of a foreseeable escape attempt, made it much more difficult for her to escape.

"At least in the truck, if she could find a key that worked she would be able to get out of there. So by him breaking the window, dragging her out, he substantially increased the danger of the foreseeable escape attempt.

"And, in fact, we know he did because she was unable to escape. She was still trapped underneath him while he was actively assaulting her two hours later.

"Did it give the defendant a greater opportunity to commit additional crimes? Absolutely. We know he continued to assault her for those two hours.

"And was there a decreased likelihood of detection? And I pose to you that, yes, there was. Somebody driving by may not have been able to see them." Allen did not object to the prosecutor's statements.

Allen now contends that the prosecutor committed prejudicial misconduct and violated his due process rights by misstating the asportation element. Allen argues that "the prosecutor's misstatement of the law was not minor or brief. Although it occurred during a single episode, the prosecutor's argument that the jury had to consider the contextual factors and that those factors established the requisite asportation occupied two pages of the reporter's transcript." To the contrary, we concluded above that it was not error for the court to instruct the jury that it must consider all of the circumstances, and the prosecutor merely restated that part of the instruction. The prosecutor did not state that the jury *must* consider the contextual factors. However, the jury was permitted to consider the contextual factors, and therefore there was nothing objectionable in the prosecutor's argument concerning those factors. Accordingly, we reject Allen's assertion of prosecutorial misconduct.

**IV.** *Ineffective Assistance*

Allen contends that his trial counsel rendered ineffective assistance by failing to object to the court's instruction concerning asportation and by failing to object to the

15

prosecutor's alleged misstatement of the law concerning asportation. A showing of ineffective assistance of counsel requires: (1) a showing that counsel's performance was deficient, "in that it fell below an objective standard of reasonableness under prevailing professional norms" and (2) a showing of resulting prejudice. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Because we have already concluded that Allen suffered no prejudice from the instruction concerning asportation or from the prosecutor's argument concerning asportation, we need not further consider this issue.

## V. *Separate Punishment for Counts 3, 4, and 5*

The court imposed separate punishment for each of the six counts with which Allen was charged. Allen argues that separate punishment on counts 3, 4, and 5 (infliction of corporal punishment, making criminal threats, and false imprisonment) violates section 654 because the acts involved in these counts were committed pursuant to a single, indivisible criminal objective of sexually assaulting T.

## A. *Standard of Review*

Section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

" 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Correa* (2012) 54 Cal.4th 331, 336.) "Where the commission of one offense is merely ' "a means toward the objective of the commission of the other," ' section 654 prohibits separate punishments for the two offenses." (*People v. Wynn* (2010) 184 Cal.App.4th 1210, 1215, called into doubt on another ground by *People v. Calderon* (2013) 214 Cal.App.4th 656, 666-667.)

16

"A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if it is supported by substantial evidence." (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.)

## B. *Infliction of Corporal Punishment*

Allen argues that the physical violence that Allen inflicted on T. was "part and parcel of the sexual assault." We disagree. The evidence shows that Allen dragged T. through the gravel and brush, to the extent that T. complained to Allen that her "whole back side" was "road rash." Allen pulled out hair from the right side of T.'s head. He hit T. in the abdominal area four times "as hard as [he] could." The infliction of these injuries was gratuitous and can reasonably be taken to show an objective to physically injure T., separate from an objective to sexually assault T. (See *People v. Galvez* (2011) 195 Cal.App.4th 1253, 1263 [acts of violence were "gratuitous, extra" and not incidental to attempted witness dissuasion].)

We conclude that separate punishment for infliction of corporal punishment did not violate section 654.

## C. *Criminal Threats*

In one of the phone calls between Allen and T. that was played to the jury, T. said: "Then you were smothering me. Then you're all like, okay, you got to go now. I'm sorry, you got to go, as you were trying to smother me to death." The threat to T. while smothering her was, like the infliction of corporal punishment, gratuitous and extra. A reasonable implication of the threat is that Allen intended to put T. in fear for her life, a purpose distinct from sexual assault or causing physical injury.

We conclude that separate punishment for making a criminal threat did not violate section 654.

## D. *False Imprisonment*

Allen committed the crime of false imprisonment by detaining T. at Pacific Shores even though she wanted to leave. We do not find evidence of intent to detain T. that is separate from Allen's intent to sexually assault, physically harm, or threaten T. during the

17

course of the night in question. It seems to us that detaining T. was merely a means toward Allen's other criminal objectives.

The People argue for separate punishment by citing *People v. Lopez* (2011) 198 Cal.App.4th 698, 717-718: "Under 654, a course of conduct divisible in time, though directed to one objective, may give rise to multiple convictions and multiple punishment 'where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken.' " Because the events of the night in question, the people argue, are temporally separated by T.'s escape to the Toyota, Allen's breaking of the Toyota's window, and Allen's kidnapping of T. from the truck, "[t]he false imprisonment [afterwards] therefore constituted an act of renewed aggression, separable from prior acts of abuse, that occurred after an opportunity to reflect and desist."

The People seem to be arguing that Allen could have been convicted for sexual assault, corporal injury, and criminal threats for his acts committed before he kidnapped T. from the truck, and that the conviction for false imprisonment could be for behavior that occurred after the kidnapping. However, the evidence in this case does not allow for an accounting of which of Allen's acts occurred before the kidnapping and which occurred after. For example, the People's argument falls apart if the threat to T.'s life occurred after the kidnapping, in which case the false imprisonment could be incidental to Allen's intent to threaten T.

The People seem to recognize this problem, conceding that "subsequent abuses to [T.'s] body occurred simultaneously with the false imprisonment." Accordingly, the People propose the alternate argument that the false imprisonment after the kidnapping "also served a distinct, nonincidental objective to prevent [T.] from calling for help. [Citations.] The false imprisonment occurred after a successful interruption of [T.'s] attempt to call for help and a kidnapping that removed [T.] from ready access to communication and a means of escape." We are not convinced.

18

It is true that Allen's detainment of T. outside the truck left her without access to her cell phone, but this does not go to prove that Allen had an intent, separate from his intent to continue his assaults upon T., to prevent T. from seeking help. The case that the People cite is distinguishable. In *People v. Saffle* (1992) 4 Cal.App.4th 434, Saffle was convicted of sexual crimes against the victim, as well as false imprisonment. (*Id.* at p. 436.) Saffle appealed, arguing that the false imprisonment was committed for the purpose of committing the sex offenses and that his separate punishment on that charge violated section 654. (*Saffle*, at p. 437.) The People contended that the false imprisonment occurred after the completion of the sexual acts and was to prevent Saffle's detection as the attacker. (*Id.* at pp. 437-438.) The court agreed with the People, noting that the victim was "restrained while being threatened with future violence to herself and her children if she reports the crimes." (*Id.* at pp. 439-440.) In *Saffle*, the court had clear evidence from the defendant's statements of an objective served by the false imprisonment that was separate from intent to sexually assault the victim. The People here would have us find the requisite intent or objective from the single circumstance that the false imprisonment after the kidnapping separated T. from her phone. That is true, but it is not enough. More is needed to show that what might easily be an accidental circumstance actually demonstrates intent.

We conclude that substantial evidence does not support a finding that Allen had an intent or objective in committing the crime of false imprisonment that was separate from the criminal objectives he had in committing his other offenses. Pursuant to section 654, separate punishment for false imprisonment may not be imposed and punishment on that charge must be stayed.[6]

## VI. *Custody and Conduct Credits*

---

[6] Allen requests that if we find a violation of section 654 that we remand for resentencing to allow the trial court to reconsider imposing concurrent sentences. Allen's arguments in this regard are not persuasive. We have no reason to believe that on remand the trial court would reach a result different than our amendment to the sentencing order specifying that the sentence on count 5 be stayed.

"The sentencing court is responsible for calculating the number of days the defendant has been in custody before sentencing and for reflecting the total credits allowed on the abstract of judgment." (*People v. Black* (2009) 176 Cal.App.4th 145, 154.) At sentencing, the trial court awarded Allen neither custody credits nor conduct credits.

Allen was entitled to credit for all days he spent in custody prior to sentencing, so long as the presentence custody is attributable to the conduct that led to the conviction. (§ 2900.5.) Allen was in presentence custody from the time of his arrest, on March 8, 2012, through his sentencing hearing on June 21, 2012. The period from March 8 through June 5 is attributable to a 90-day parole sanction in another matter. Thus, Allen should have received 16 days of credit for the period from June 6 through June 21.[7] The People agree that Allen should have received 16 days of credit.

The presentence probation report recommended that the court not award Allen presentence conduct credits, citing section 1170.12, subdivision (a)(5), as authority. However, section 1170.12, subdivision (a)(5), does not apply to presentence conduct credits. (*People v. Thomas* (1999) 21 Cal.4th 1122, 1125-1126.) Because of his conviction on count 1, Allen is limited to 15 percent of his presentence time served for conduct credit. (§§ 2933.1, subd. (a); 667.5, subd. (c).) Accordingly, Allen should have received 2 days conduct credit. The People concur.

## DISPOSITION

The judgment is modified to provide (1) that the sentence imposed on count 5 be stayed pending the completion of the sentence on count 1, such stay to become

---

[7] Allen claims 17 days of credit, but he miscalculated, including June 5, 2012, both in the period during which he was serving the probation sanction and in the period for which credit was due.

permanent thereafter, and (2) that Allen receive 16 days credit for time served and 2 days conduct credit.  In all other respects, the judgment is affirmed.


                                _____

                                Brick, J.*


We concur:


_____

Haerle, Acting P.J.


_____

Richman, J.


      * Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21