Filed 3/17/26  P. v. Serrano CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B340620 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA491812) |
| v. | |
| CESAR ERNESTO SERRANO, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael Garcia, Judge.  Affirmed.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Amanda V. Lopez and Nicholas J. Webster, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Cesar Serrano of sex offenses committed at different times against three victims. On appeal, he contends there was insufficient evidence he forcibly raped one victim, a mistrial should have been granted based on improper expert opinion about his guilt, the trial court incorrectly instructed that sexual penetration by use of force is a general intent crime, and the trial court incorrectly instructed on the element of asportation for simple kidnapping. We conclude that sufficient evidence supports the judgment and that prejudicial error did not occur.

## BACKGROUND

Serrano was charged with sexual offenses committed in 2017 and 2018 against three victims: Charisma P., Evelyn M., and Rachel R. The crimes remained unsolved until 2020, when DNA evidence implicated Serrano in them.

I.   Charisma P.

On the evening of April 13, 2017, 15-year-old Charisma P. was at her friend Ariana's house on Valley Boulevard and Williams Place. When Ariana told Charisma she could not spend the night, Charisma called her boyfriend, who said she could stay at his place.

At about 10:00 p.m., Charisma began the 40-minute walk to her boyfriend's house in Lost Hills. Charisma was on Eastern Avenue when a man approached her from behind and pressed a gun into her back. The man told her to keep walking, removed the clip from the gun to show her that the gun was loaded, and then pressed the gun to her neck. They walked about 10 minutes to El Sereno Park. The man took her to a secluded area at the skate park where he bent Charisma over a wall, unbuckled her

2

pants, rubbed his penis against her vagina, and penetrated her with a finger and then with his penis. The man told Charisma to say she loved him and to call him "daddy." He lost his erection and reinserted his penis, but he could not stay erect.

The man pulled Charisma's hair to bring her to her knees to make her orally copulate him. However, Charisma kept her mouth closed and resisted, and the man seemed to get flustered and upset. He gave up and left.

Charisma eventually returned home, and her grandmother took Charisma to the hospital. At the hospital, Charisma had a sexual assault examination. Charisma had a red area on the back of her neck and a laceration to her external genitalia and perineum. The lacerations were consistent with the sexual assault that Charisma reported.

Charisma testified that she did not get a good look at the man's face, but she identified Serrano as her assailant at trial.

II.    Evelyn M.

On July 23, 2017, Evelyn M. was 13 years old. That day, Evelyn was with her friend Mary Jane. At about 10:00 p.m., Mary Jane's sister took Evelyn and Mary Jane to a party, and Evelyn left her cellphone and house keys in the sister's car so that she would not lose them. At the party, Evelyn drank a bottle of alcohol. The party lasted only about an hour because the police shut it down. Evelyn took an Uber home.

Back at her apartment complex, Evelyn was unable to get into her apartment and nobody answered the door. Not feeling safe waiting outside, Evelyn decided to walk to her friend's house 15 minutes away on foot. Feeling unwell, Evelyn stopped at the corner of Cesar Chavez Avenue and Evergreen Avenue to catch her breath. A man in a car asked if she needed a ride. At trial,

3

Evelyn identified Serrano as the man. Evelyn said she did not need a ride, but Serrano showed her a gun and told her to get into the car. Feeling she had no choice, Evelyn got into the car. Serrano told her that they were going to have a good time.

Serrano drove her to a motel, but Evelyn did not know where they were and could only say they had gotten on the freeway. Telling Evelyn not to scream and to obey him or he would kill her, Serrano held Evelyn's hand and took her to a room on the second floor. Once in the room, Serrano propped chairs against the door. He removed Evelyn's dress and kissed her all over her body. Serrano sniffed cocaine, and pulled Evelyn by her hair to try and make her snort some too. He then penetrated Evelyn anally and vaginally and then anally again with his penis. He forced Evelyn to orally copulate him.

Evelyn begged Serrano not to rape her. When she screamed, he put his hand over her mouth and a knife to her neck and told her not to move. He said that he enjoyed her begging, that she was a bad girl, and that girls who were out late at night were asking for it. Serrano told Evelyn that he would make money by selling her to men. He told Evelyn to call him "daddy" and that his name was Jose Rivas. Evelyn tried to leave the room, but Serrano grabbed her arms "very hard," pushed her back onto the bed, and continued to rape her.

Evelyn was in the motel room with Serrano for over five hours. It was daylight when they left. Serrano drove them to a shopping plaza in Baldwin Park, where he said he would buy dresses for her because he was going to turn her into a prostitute. When Evelyn refused to tell Serrano her shoe size, he called her a "stupid bitch," pulled her shoes off her, got out of the car, and

4

went into a store, leaving Evelyn in the car. Evelyn ran to a store, where an employee called the police for her.

Evelyn was taken to a hospital, where she had a sexual assault examination. She told the examiner that she had been anally penetrated, but she was unsure whether Serrano had penetrated her vaginally. Evelyn had petechia to her arms, injury to her breasts, and abrasions to her butt. The examiner made no vaginal or anal findings but noted that only 50 percent of reported forcible sexual assaults have visible injuries to the genitalia. And the injuries Evelyn did have were consistent with the sexual assault she reported.

III.    Rachel R.

On July 23, 2018, 23-year-old Rachel R. was visiting California for a wedding with her family. At the wedding that evening, Rachel had about 10 glasses of wine. She returned with her family to the motel where they were staying. Rachel argued with her family and left the motel. The next thing she remembered was waking in a house with a man on top of her with his penis inside her vagina. Rachel testified that at "that moment, I felt like I wasn't completely there, and I don't think I said anything in the beginning, as I felt like I was not completely coherent at the moment." Eventually, she became more coherent and said she should not be there and did not belong there. The man told her to be quiet or she would wake his grandmother in the next room. When Rachel continued to say she did not know him and did not belong there, he put a pillow over her face, which muffled her voice. Rachel had a hard time moving because the man was "large and on top of me, basically holding me down." The man eventually stopped when Rachel started to move more.

After the man got off of Rachel, he lit a pipe and blew smoke into her mouth while holding her arms to her side so that she could not stop him. Rachel resisted and was able to get into a sitting position. She asked if she could call her mom, and the man allowed her to use his cellphone, but he used a code to block the number. Rachel called her mother, who gave the phone to Rachel's father, but the man then hung up the phone. The man told Rachel to be quiet and put his mouth on her vagina. Rachel was afraid that if she pushed him away he would hurt her. Although he told her to be quiet, she said she would scream if he did not let her leave. The man said okay, and walked her out of the house. Rachel ran to a gas station where a stranger let her use his phone to call her parents.

Rachel's parents took her to a hospital, where she had a sexual assault examination. The examiner observed two suction injuries on Rachel's neck and left breast, tenderness to her wrist, and an abrasion on her left shoulder. Rachel had multiple bruises to her hymen, and tenderness and an abrasion to her fossa navicularis, which is outside the entryway to the hymen. All of Rachel's injuries were consistent with the sexual assault she reported.

At trial, Rachel could not identify Serrano as her attacker.

IV.    The investigation

As part of the sexual assault examinations, the examiners swabbed parts of Charisma's, Evelyn's, and Rachel's bodies for potential DNA analysis. In November 2020, the male DNA in Rachel's sexual assault kit was identified as Serrano's, and, further, it matched the male DNA in Charisma's and Evelyn's cases.

The male DNA profile from Charisma's neck was consistent with Serrano's DNA profile with a one in 600 quadrillion probability of encountering that profile at random. The male DNA profile from Charisma's left breast matched Serrano's DNA profile with a one in two quintillion probability of encountering that profile at random. And the male DNA profile from Charisma's buttocks was consistent with Serrano's DNA profile with a one in a hundred trillion probability of encountering that profile at random.

The DNA on Evelyn's right buttock and neck matched Serrano's DNA profile, with the odds of a random match greater than one in one septillion. DNA on Evelyn's anal area matched Serrano's DNA with a one in 20 billion chance of a random individual having that same DNA.

DNA on Rachel's vulva matched Serrano's DNA profile, and it was "three times ten to the 28 times" more likely the profile came from Rachel and Serrano rather than from Rachel and another person. Serrano's DNA was also detected on Rachel's mouth and genitals, with high probabilities that it was Serrano's DNA and not a random individual's DNA.

V.    Verdict and sentence

As to Evelyn, the jury convicted Serrano of forcible rape of a child under 14 years (Pen. Code,[1] § 261, subd. (a)(2); count 1), forcible sodomy on a victim under the age of 14 (§ 286, subd. (c)(2)(B); count 2), forcible oral copulation on a victim under the age of 14 years (§ 288a, subd. (c)(2)(B); count 3), and kidnapping to commit rape (§ 209, subd. (b)(1); count 4). As to counts 1, 2,

---

[1]    All further undesignated statutory references are to the Penal Code.

7

and 3, the jury found true special allegations, within the meaning of section 667.61, subdivisions (e) and (j)(1), that Serrano kidnapped Evelyn (§ 209) and had multiple convictions in the present case for an offense of rape by force or fear, sexual penetration by force or fear, oral copulation by force or fear, and/or sodomy by force or fear.  The jury also found as to counts 1 and 2 that Serrano personally used a deadly weapon in the commission of the offenses (§ 12022, subd. (b)(1)).

As to Charisma, the jury convicted Serrano of forcible rape of a child over 14 years (§ 261, subd. (a)(2); count 5), kidnapping to commit rape (§ 209, subd. (b)(1); count 6), and forcible sexual penetration of a minor over 14 (§ 289, subd. (a)(1(C); count 7).  As to counts 5 and 7, the jury found true special allegations, within the meaning of section 667.61, subdivisions (e) and (j)(1), that Serrano kidnapped Charisma (§ 209) and had multiple convictions in the present case for an offense of rape by force or fear, sexual penetration by force or fear, oral copulation by force or fear, and/or sodomy by force or fear.  The jury found not true the allegations he personally used a deadly weapon in commission of the offenses as to counts 5 and 7 (§ 12022, subd. (b)(1)).

As to Rachel, the jury convicted Serrano of forcible rape (§ 261, subd. (a)(2); count 9)[2] and found true the special allegation that Serrano had multiple convictions in the present case for an offense of rape by force or fear, sexual penetration by force or fear, oral copulation by force or fear, and/or sodomy by force or fear (§ 667.61, subds. (e), (b)).

On September 5, 2024, the trial court sentenced Serrano to consecutive life without parole terms on counts 1 and 5 plus 15

---

[2]    The People dismissed count 8.

8

years to life on count 9.  The trial court imposed concurrent life without parole terms on counts 2, 3, and 7 and imposed but stayed life without parole terms on counts 4 and 6.

## DISCUSSION

I.  Sufficiency of the evidence to support Serrano's conviction for the forcible rape of Rachel

Serrano contends that the evidence was insufficient to prove he forcibly raped Rachel.  We disagree.

The substantial evidence standard of review requires us to " 'review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.  [Citation.]  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]  A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890; *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.)  Our "task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might ' " 'be reasonably reconciled with the defendant's innocence.' " ' " (*People v. Gomez* (2018) 6 Cal.5th 243, 278; accord, *People v. Rodriguez* (1999) 20 Cal.4th 1, 12 [reversing court of appeal that reweighed evidence].)  Rather, we must accept any logical inferences the finder of fact might

9

have drawn from the evidence, and we may set aside a judgment only if it clearly appears that on no hypothesis is there substantial evidence to support the verdict. (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)

Turning to the substantive offense, section 261 defines rape as an act of sexual intercourse accomplished under any of seven circumstances.[3] One circumstance of forcible rape occurs when the victim is "unconscious of the nature of the act, and this is known to the accused." (§ 261, subd. (a)(4).) " '[U]nconscious of the nature of the act' " includes where the victim is unconscious or asleep. (§ 261, subd. (a)(4)(A).) Serrano was not charged with or convicted under that circumstance.

Instead, Serrano was convicted of forcible rape under subdivision (a)(2) of section 261, which provides that another circumstance of forcible rape is where it is accomplished "against the person's will, by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." The physical force used need only be of a degree sufficient to support a finding that the sexual intercourse was against the victim's will. (*People v. Griffin* (2004) 33 Cal.4th 1015, 1023–1024.) The degree of necessary force is not substantially different from or greater than the physical force normally inherent in an act of consensual sexual intercourse. (*Id.* at p. 1023.) There is no requirement that the victim physically resist the defendant. (*Id.* at pp. 1024–1025; *People v. Dearborne* (2019) 34 Cal.App.5th 250, 258.)

---

[3]     The circumstances describe different offenses, and a defendant may be convicted of more than one for a single act of intercourse but punished only once under section 654. (*People v. White* (2017) 2 Cal.5th 349, 352.)

Here, Serrano argues that there was insufficient evidence of a forcible rape because Rachel was unconscious when he began sexual intercourse with her, and what happened when she woke up did not amount to force.  (See, e.g., *People v. Brown* (2017) 11 Cal.App.5th 332, 340 [insufficient evidence of force where defendant tried to penetrate victim, victim pushed him away, victim passed out, and any sex act occurred after victim passed out].)  Not so.  Rather, when Rachel gained consciousness, she was not initially coherent, but she knew she should not be there and did not belong there.  Serrano concedes that Rachel communicated these thoughts, but he asserts they merely spoke to the "notion that she should not be present in that situation" and did not "communicate a desire not to engage in intercourse."  However, the jury could reasonably infer or understand Rachel's statements to convey that she did not want to engage in intercourse, especially given the context in which she made those statements:  waking up in an unfamiliar house with an unfamiliar man who was having sexual intercourse with her.

Serrano also dismisses evidence he put a pillow over Rachel's face as merely an effort to stop her from waking his grandmother and not to overcome her will to resist.  Again, the jury could infer from this evidence that Rachel was vocalizing her resistance, and Serrano quieted her resistance by putting a pillow over her face.  Moreover, Rachel testified that Serrano was on top of her, basically holding her down.  The jury could find that Serrano used his body to restrain Rachel.  (See, e.g., *People v. Dearborne*, *supra*, 34 Cal.App.5th at p. 259 [sufficient evidence of forcible rape where defendant used his entire body to pin victim down]; see *People v. Griffin*, *supra*, 33 Cal.4th at p. 1029 [force element satisfied where defendant pinned victim's arms during

11

intercourse].) Indeed, it was only when Rachel was able to move more—i.e., physically resist more—that Serrano got off of her.

We therefore conclude that there was sufficient evidence to support Serrano's conviction of forcibly raping Rachel.

II.    Admission of opinion evidence

Serrano next contends that the jury heard improper expert opinion testimony that required a mistrial. The issue arose during cross-examination of Detective Danetta Minifee, who swabbed Serrano to obtain a DNA sample. Defense counsel questioned the detective about her efforts to get video surveillance of places Evelyn testified about, asking whether having video surveillance of the suspect's face "would be pretty big in this investigation, would it not?" The detective responded, "Also DNA." At defense counsel's request, the trial court struck the testimony and told the jury to "disregard that in your deliberations." Defense counsel did not then ask for a mistrial.

Serrano characterizes the detective's testimony as a lay or expert opinion on his guilt. (See generally, Evid. Code, § 800 [lay witness may express opinion based on witness's own perception where helpful to clear understanding of the witness's testimony]; Evid. Code, § 801 [expert may provide opinion on subject that is sufficiently beyond common experience and that would assist trier of fact].) A witness, whether lay or expert, may not express an opinion on the defendant's guilt or innocence because that opinion is of no assistance to the trier of fact. (*People v. Duong* (2020) 10 Cal.5th 36, 60.)

Here, the detective did not expressly opine on Serrano's guilt or innocence. Instead, when asked if having video of the suspect's face would be "pretty big" in the investigation, the detective responded that DNA was "also" part of the

12

investigation.  Thus, the detective did not answer whether having a picture of the suspect's face would be valuable.  Therefore, the answer was not responsive to the question, and, as such, properly stricken.  (See generally, Evid. Code, § 766 [unresponsive answers shall be stricken on party's motion].)

But even if the detective's comment could be construed as a suggestion that Serrano was guilty because of the DNA evidence, it still would not warrant a mistrial.  " ' " 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.  [Citation.]  Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.  [Citation.]' [Citation.] A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " ' " (*People v. Dalton* (2019) 7 Cal.5th 166, 240.)

Serrano's counsel did not move for a mistrial, and therefore the issue is arguably forfeited.  (See, e.g., *People v. Carrasco* (2014) 59 Cal.4th 924, 965.)  But even if Serrano preserved the issue, the detective's statement did not irreparably damage his chance of receiving a fair trial.  As we have said, the detective's comment was very brief, and the trial court immediately struck it and told the jury to disregard it.  Such a curative admonishment helps cure any prejudice that might result from erroneously admitted evidence.  (See, e.g., *People v. Wharton* (1991) 53 Cal.3d 522, 566.)  Moreover, defense counsel did not dispute that Serrano's DNA was on the victims, although he did argue that he did not rape or kidnap them.  Therefore, Serrano's defense was not based on contesting identity.  Stated otherwise, he did not

contest that DNA played a role in identifying him, which is what the detective said.

The cases Serrano cites for the proposition that a witness's single improper statement can irreparably damage a defendant's chance of a fair trial do not support that a mistrial should have been granted. In *People v. Navarette* (2010) 181 Cal.App.4th 828, 831, a detective willfully violated a court order by referring to the defendant's statement, which had been suppressed under *Miranda*. The court held that the defendant's mistrial motion should have been granted because the jury was likely to understand that the defendant had confessed. In *People v. Bentley* (1955) 131 Cal.App.2d 687, 690,[4] a police officer testifying in a sexual assault case involving a minor victim said that the defendant had been a suspect in a prior case. The appellate court held that the defendant's mistrial motion should have been granted.

*Navarette* and *Bentley* thus involved egregious references, respectively, to a defendant's confession and to a prior uncharged sexual assault. In contrast, the detective here referred to DNA evidence linking Serrano to the victims, a point the defense did not dispute. What happened here is simply not akin to the prejudice flowing from a jury hearing that a defendant had confessed and that a defendant had committed a similar sexual assault.

III.   Instructional error on general and specific intent crimes

The trial court incorrectly instructed the jury that count 7 for sexual penetration by use of force is a general intent crime,

---

[4]   Disapproved on other grounds in *People v. White* (1958) 50 Cal.2d 428, 430–431.

14

when it is a specific intent crime. As we now explain, the error was not prejudicial.

Criminal defendants have the right to "a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." (*United States v. Gaudin* (1995) 515 U.S. 506, 510.) Thus, a "trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense." (*People v. Merritt* (2017) 2 Cal.5th 819, 824.) A court's failure to instruct on the elements of an offense or any misinstruction that relieves the jury of its burden to find the defendant guilty of every element beyond a reasonable doubt violates a defendant's due process rights. (*People v. Hendrix* (2022) 13 Cal.5th 933, 942.) We determine the correctness of jury instructions from the entire charge of the court. (*People v. Bolin* (1998) 18 Cal.4th 297, 328.) And we review a claim of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

The trial court instructed the jury with CALCRIM No. 252 as follows:

> All the crimes and allegations charged require proof of the union, or joint operation, of act and wrongful intent.
> The following crimes and allegations require general criminal intent: Forcible Rape as charged in Counts 1, 5, and 9; Sodomy by Use of Force, as charged in Count 2; Forcible Oral Copulation, as charged in Count 3; *Sexual Penetration by Use of Force, as charged in Count 7*; … For you to find a person guilty of these crimes …, that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act;

15

however, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime or allegation.

(Italics added.)

Contrary to this instruction, sexual penetration by use of force is a specific intent crime that requires the People to prove that the defendant penetrated the victim with the intent to gain sexual arousal or gratification or to inflict abuse on the victim. (*People v. ZarateCastillo* (2016) 244 Cal.App.4th 1161, 1166–1167.) We therefore must consider whether the incorrect instruction prejudiced Serrano.

Courts are in conflict as to the proper standard for assessing prejudice for this type of error, with some suggesting that the " 'reasonable likelihood' " standard in *People v. Watson* (1956) 46 Cal.2d 818 applies (see, e.g., *People v. Ngo* (2014) 225 Cal.App.4th 126, 158, 162–163), and others applying the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (see, e.g., *People v. ZarateCastillo*, *supra*, 244 Cal.App.4th at pp. 1168–1169). (See generally, *People v. Saavedra* (2018) 24 Cal.App.5th 605, 615.)

We need not decide under what standard we review the error, because it was harmless under either the *Watson* or *Chapman* standard. In addition to convicting Serrano of forcible sexual penetration of a minor victim over 14 (§ 289, subd. (a)(1(C)), the jury also convicted him of kidnapping to commit rape (§ 209, subd. (b)(1); count 6), which is also a specific intent crime. The jury would not have found that Serrano kidnapped Charisma to rape her for the purpose of sexually gratifying himself but penetrated her for some other purpose.

16

Moreover, the record contains no evidence that Serrano had some purpose other than his sexual gratification or arousal in penetrating Charisma. Instead, he kidnapped a 15-year-old girl, took her to a secluded area, told her to say she loved him and to call him "daddy," and penetrated her with his fingers and penis. Courts considering similar circumstances and error have found that the sexual abuse could have been committed for no other than purpose than a sexual one. In *People v. Canales* (2024) 106 Cal.App.5th 1230, for example, the trial court misinstructed the jury that continuous sexual abuse was a general intent crime, when it is a specific intent crime. In finding the error harmless beyond a reasonable doubt, the appellate court said, "Only one reason explains why an adult man, in secret, touches a girl's vagina and, afterwards, gives her money and tells her not to tell her mother, and does so repeatedly. … Canales's *purpose* was to cause sexual arousal. No other mental state fits the facts." (*Id.* at p. 1251; accord, *People v. Saavedra*, *supra*, 24 Cal.App.5th at p. 616 ["The record on appeal—which we have carefully reviewed—contains no evidence that could rationally lead to a finding the act of penetration … was committed for a purpose other than sexual arousal, gratification, or abuse"]; *People v. ZarateCastillo*, *supra*, 244 Cal.App.4th at p. 1169 ["Nor is there any basis for believing that the jury could have, under any circumstances, rationally found that defendant penetrated the victim's vagina for any purpose *other* than sexual abuse, arousal, or gratification"].)

Finally, the trial court otherwise properly instructed the jury with CALCRIM No. 1045, that sexual penetration by force required the People to prove that Serrano penetrated the victim "for the purpose of sexual abuse, arousal, or gratification."

Considering the jury instructions as a whole, therefore, the jury would have understood that an element of the crime was Serrano's sexual self-gratification or arousal.

Serrano, however, dismisses CALCRIM No. 1045, citing *People v. Maurer* (1995) 32 Cal.App.4th 1121 for the proposition that reversal is required where a trial court gives conflicting instructions. In that case, the court gave conflicting instructions on motive. On the substantive offense of child annoyance, the court instructed that the conduct had to be motivated by an unnatural or abnormal sexual interest in the victim. (*Id.* at p. 1125.) But a separate instruction stated that motive was not an element of the crime charged and need not be shown. (*Ibid.*) The appellate court found the conflicting instructions to be prejudicial error because it could not conclude based on the state of the evidence that the error was harmless beyond a reasonable doubt. In contrast, and as we have said, the evidence here, beyond a reasonable doubt, showed that Serrano forcibly penetrated Charisma for a sexual purpose.[5]

IV.    Instructional error on lesser included offense of simple kidnapping

The trial court instructed the jury on kidnapping to commit rape as to Charisma and on its lesser included offense of simple kidnapping (count 6). Serrano contends, and the Attorney

---

[5]    Because we conclude that Serrano was not prejudiced by any error in CALCRIM No. 252, we need not address his alternative claim that his trial counsel provided ineffective assistance of counsel by failing to object to the instruction. (See generally, *Strickland v. Washington* (1984) 466 U.S. 668, 687 [ineffective assistance of counsel claim requires a showing of error *and* prejudice].)

General concedes, that the simple kidnapping instruction incorrectly defined the asportation element of that crime.

Kidnapping for rape and simple kidnapping both have an asportation element.  (§§ 207, 209, subd. (b)(2); see generally *People v. Waqa* (2023) 92 Cal.App.5th 565, 577.)  Kidnapping for rape requires the defendant to move the victim, and the movement must not be merely incidental to the rape.  (§ 209, subd. (b)(2).)  The movement must "increase[ ] the risk of harm to the victim over and above that necessarily present in" the rape.  (*Ibid.*; *People v. Rayford* (1994) 9 Cal.4th 1, 22.)  In making this determination, a jury should consider whether the movement decreased the likelihood of detection, increased the danger inherent in a victim's foreseeable attempts to escape, or enhanced the attacker's opportunity to commit additional crimes.  (*Rayford*, at p. 13.)

In contrast, the asportation element of the lesser included offense of simple kidnapping requires only that the defendant move the victim a substantial distance and that the movement was not merely incidental to the sexual offense.  (§ 207, subd. (e); *People v. Waqa*, *supra*, 92 Cal.App.5th at p. 583.)  Whether the movement was substantial depends on the totality of the circumstances, including the actual distance the defendant moved the victim, whether the movement increased the risk of harm above that which existed before the asportation, decreased the likelihood of detection, and increased the danger inherent in the victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes.  (*People v. Perkins* (2016) 5 Cal.App.5th 454, 465.)  While a jury may consider the risk of increased harm, it is not a necessary finding, as it is for aggravated kidnapping.  (*Ibid.*)

In sum, the difference between kidnapping for rape and simple kidnapping is that the former requires the defendant to move the victim a substantial distance *and* increase the risk of harm to the victim, while the latter requires only that the defendant move the victim a substantial distance.

In accord with this law, the trial court correctly instructed the jury on kidnapping for rape, that substantial distance "means more than a slight or trivial distance. The movement must have increased the risk of physical or psychological harm to the person beyond that necessarily present in the rape, oral copulation, or sodomy. In deciding whether the movement was sufficient, consider all the circumstances relating to the movement." (CALCRIM No. 1203.) But, contrary to the law, the trial court modified the standard instruction on simple kidnapping and included the same definition of "substantial distance" in its simple kidnapping instruction. (CALCRIM No. 1215.)[6] In doing so, the trial court incorrectly instructed that the lesser offense of simple kidnapping required the movement to increase the risk of

---

[6] CALCRIM No. 1215, unmodified, provides: "*Substantial distance* means more than a slight or trivial distance. In deciding whether the distance was substantial, you must consider all the circumstances relating to the movement. [Thus, in addition to considering the actual distance moved, you may also consider other facts such as [whether the distance the other person was moved was beyond that merely incidental to the commission of [the associated crime], whether the movement increased the risk of [physical or psychological] harm, increased the danger of a foreseeable escape attempt, or gave the attacker a greater opportunity to commit additional crimes, or decreased the likelihood of detection.]"

20

physical or psychological harm to Charisma beyond that necessarily present in the rape.

In addition to the substantive offense, Serrano was charged with special allegations under the "One Strike" law, section 667.61, which, if found true, subjected him to an alternative, harsher sentencing scheme. The jury was instructed that if it found Serrano guilty of the crimes charged in counts 1, 2, 3, 5, and 7, it had to decide whether, for each crime, the People proved the additional allegation that Serrano "kidnapped Evelyn M. and Charisma P." To decide that, the instruction referred the jury to the separate kidnapping instructions, including CALCRIM No. 1215, which included the incorrect statement of law.

Serrano asserts that adding the improper requirement to CALCRIM No. 1215 made it more difficult for jurors to find him guilty of simple kidnapping. This forced the jury into an all-or-nothing choice between the charged offense and acquittal.

However, under either the *Watson* or *Chapman* standard, the error here was harmless. In arguing that it is probable the jury would have found he did not increase the risk of harm to Charisma by moving her to the park, Serrano focuses on the public nature of the park. He concedes that had he moved Charisma from a public area to a private indoor one, there would have been little doubt he increased the risk of harm to her. (See, e.g., *People v. Arias* (2011) 193 Cal.App.4th 1428, 1435 [moving victim from public area to "seclusion of his apartment" increased risk of harm to victim].) But, he asserts, all he did was move Charisma from one public area, a street, to another public area, a park.

We are unpersuaded. A substantial change in the context of the environment suggests a movement that is not incidental to

the rape.  (*People v. Rayford, supra*, 9 Cal.4th at p. 23.)  Thus, moving a victim from a public area to a place out of public view can increase the risk of harm to the victim.  (*People v. Shadden* (2001) 93 Cal.App.4th 164, 169.)  In *Rayford*, at page 23, for example, the defendant moved the victim 105 feet at night from a closed store's parking lot to the other side of a wall at the lot's edge.  A wall, trees, and bushes limited any passerby's view.  The court held that the jury could reasonably conclude that forcibly moving the victim under these circumstances was not merely incidental to the attempted rape and substantially increased her risk of harm.  (*Ibid.*)

In *People v. Diaz* (2000) 78 Cal.App.4th 243, 248 to 249, the defendant moved the victim from a bus stop at a lit intersection, into a park, and then to the back side of a recreation building to assault her.  The court said, "The scope and nature of the movement dramatically changed the environmental context."  (*Id.* at p. 248.)  Accordingly, the "forcible movement of the victim into the darkened park and behind a large building was properly found by the jury to have been more than incidental to the sexual assault."  (*Id.* at p. 249.)

Although the issues in *Diaz* and *Rayford* were whether the evidence was sufficient to support the kidnapping charges, they nonetheless support that any error in the CALCRIM No. 1215 was harmless.  Similar to those cases, Charisma was on a public street when Serrano forced her at gunpoint to walk about 10 minutes to El Sereno Park, where Serrano forced her to an even more secluded area near the skating park.  Although the park was a public place, it was nonetheless out of public view.  Charisma described the park as secluded, and it was after 10:00 o'clock in the evening, a time when public parks would

22

either be closed or parkgoers likely would not be present. Thus, Serrano moved Charisma from an open street where people walking or driving by could see her to a secluded area where it was unlikely anyone would pass by.[7] In doing so, Serrano increased the psychological harm to Charisma, whose chances of help were greatly diminished by the movement.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

EGERTON, J.

ADAMS, J.

---

[7] What happened to Evelyn demonstrates the point. Before Serrano kidnapped Evelyn on the street, a couple in a car asked Evelyn if she needed help, but she refused. Thus, while Evelyn was on a public street, even late at night, there were increased opportunities for help or of detection of a crime.